### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **MITCHEL PERIANDRI, et al.,** | : | **Case No. 1:02CV257** |
| | : | **1:02CV336** |
| **Plaintiffs,** | : | **1:02CV399** |
| | : | |
| **v.** | : | **JUDGE O'MALLEY** |
| | : | |
| **CUYAHOGA COUNTY, et al.,** | : | |
| | : | **MEMORANDUM & ORDER** |
| **Defendants.** | : | |

The following three cases have all been consolidated, because they all revolve around a common (and complicated) nucleus of operative facts: (1) <u>Periandi v. Cuyahoga Cty.</u>, 1:02-CV-257; (2) <u>Bowman v. Cuyahoga Cty.</u>, 1:02-CV-336; and (3) <u>Delgado v. Cuyahoga Cty.</u>, 1:02-CV-399. In all three cases, the defendants include: (1) Cuyahoga County Detective Anthony Quirino; and (2) Cuyahoga County Detective David Schilling. The latter two cases also name as a defendant: (3) Tracey Mora.[1]

The plaintiffs in the first case include nine members of a single family, being: (1) brothers

---

[1] The plaintiffs in these three cases originally named certain other defendants, including: Cuyahoga County; Cuyahoga County Prosecutor Paul Myles; Cuyahoga County Prosecutor Carmen Marino; and Wendy Sporcich. As noted in the Court's Order dated February 24, 2000 (docket no. 110), however, the plaintiffs made clear that they are no longer pursuing claims against these defendants. Accordingly, these defendants were dismissed as parties in this case, leaving only Quirino, Schilling, and Mora as parties-defendant. The operative complaints in each case are: (1) the Periandris' first amended complaint, docket no. 42 in case no. 02-CV-257; (2) Bowman's second amended complaint, docket no. 54 in case no. 02-CV-336; and (3) Delgado's first amended complaint, docket no. 22 in case no. 02-CV-399.

Mitchel, Dante, Gino, and Marco Periandri; (2) their spouses, Angela Periandri (Gino), Sheila Periandri (Marco), and Renee Seese (Dante); (3) their mother, Charline Cossu; and (4) their cousin, Jerome Periandri.  The lone plaintiff in the second case is Kathleen Bowman, a Cleveland Police Officer who was romantically involved with Mitchel Periandri.  The lone plaintiff in the third case is Antonio Delgado, who allegedly knew some of the Periandris.  To avoid confusion, the Court refers below to the plaintiffs who share the Periandri surname by their first name.

The plaintiffs all allege they were arrested and charged with various crimes, none of which were supported by probable cause.  Based on their allegations, various plaintiffs assert the following claims against the defendants: (1) deprivation of Fourth and Fifth Amendment rights, in violation of 42 U.S.C. §§1983, 1985, & 1986; (2) malicious prosecution; (3) false arrest; (4) false imprisonment: (5) invasion of privacy (6) negligent and intentional infliction of emotional distress; (7) defamation; (8) trespass; (9) assault and battery; (10) violation of the search and seizure provisions contained in the Ohio Constitution; and (11) unlawful restraint, in violation of Ohio Rev. Code §2905.03.

In each of the three cases, defendants Quirino and Schilling have moved for summary judgment on all claims.  See case no. 02-CV-257, docket nos. 83, 91, 92; case no. 02-CV-336, docket nos. 79, 80; and case no. 02-CV-399, docket nos. 45, 46.[2]  Defendant Mora has not moved for summary

---

[2]  With docket no. 83, defendants Quirino and Schilling move for summary judgment on all claims made by Dante only, premised on his having filed bankruptcy without disclosing his claims in this case.

judgment in any of the three cases, so all claims against her remain pending.[3]

For the reasons stated below, these summary judgment motions are all **GRANTED IN PART and DENIED IN PART**. The chart attached as Exhibit A shows the status of each of the plaintiffs' claims (those that remain pending for trial are set out in bold, while claims that are dismissed are shown in italics). The chart reflects, among other things, that summary judgment is **GRANTED** as to: (1) all claims against defendants Quirino and Schilling by plaintiffs Jerome Periandri, Dante Periandri, Delgado, and Cossu;[4] (2) all Fourth Amendment arrest claims by all plaintiffs stemming from the "re-arrests" on March 2, 2001; (3) all Fourth Amendment malicious prosecution claims by all plaintiffs; (4) all Fourth Amendment claims by all plaintiffs related to searches pursuant to warrant; (5) all claims by all plaintiffs brought pursuant to 42 U.S.C. §§1985 & 1986; (6) all state law malicious prosecution claims by all plaintiffs against defendants Quirino and Schilling; (7) all state law false arrest and false imprisonment claims by all plaintiffs stemming from the "re-arrests" on March 2, 2001; (8) all state law claims by all plaintiffs for violation of Ohio statutes regarding unlawful restraint and search and seizure; (9) all state law claims by all plaintiffs for invasion of privacy; (10) all state law claims for defamation by all plaintiffs against defendants Quirino and Schilling; and (11) all state law claims by all plaintiffs for trespass.

---

[3] Also pending is a motion by plaintiffs to strike an affidavit related to the summary judgment briefs (docket no. 104). This motion is **DENIED as moot,** for two reasons: (1) this Court normally will not employ Rule 12(f) to strike an affidavit because "the rule relates only to pleadings and is inapplicable to other filings," Dawson v. City of Kent, 682 F. Supp. 920 (N.D. Ohio 1988), affirmed, 865 F.2d 257 (6th Cir. 1988); and (2) in any event, the Court did not rely on the affidavit in any way in its analysis.

[4] Although this Order resolves all claims by Jerome and Dante against defendants Quirino and Schilling, Jerome and Dante still have claims pending against Mora, who did not move for summary judgment. Delgado and Cossu, however, did not bring any claims against Mora. Thus, as noted below, Delgado and Cossu are dismissed as parties in this case.

This leaves pending various claims by various plaintiffs, as shown in the chart and discussed below.  Given that all of plaintiff Delgado's claims against all the defendants whom he named have been dismissed, his lawsuit (<u>Delgado v. Cuyahoga Cty.</u>, 1:02-CV-399) is **DISMISSED** in its entirety. Similarly, all of plaintiff Cossu's claims against all the defendants whom she named have been dismissed; accordingly, she is **DISMISSED** as a party from this case.  The Court will issue separate Orders to this effect, pursuant to Fed. R. Civ. P. 54(b) and 58.

The Court notes that: (1) it has concluded that qualified immunity does <u>not</u> protect Detectives Schilling and Quirino from defending themselves against certain claims; and (2) the defendants have brought only state law claims against Mora.  The Court now has several options, including: (a) trying certain remaining claims immediately (e.g., all of the claims against Mora); (b) dismissing certain pendent state-law claims without prejudice (e.g., all of the claims against Mora); (c) staying this entire matter pending appeal, if the defendants choose to pursue one; and/or (d) broaching settlement.  To discuss these and related matters, the Court hereby sets a **STATUS CONFERENCE, to take place on October 20, 2004, at 1:30 p.m.**

The Court now sets out below its reasoning on the myriad of claims presented.


I.  Facts.

Except where noted, the following material facts are not in dispute.  Because the critical issue in this case boils down to what Detectives Quirino and Schilling knew and when they knew it, the Court has attempted to recite in chronological order the important facts known to those defendants.  The exhibits submitted by the parties, however, reveal the Detectives engaged in a long-running and complicated investigation, with many odd developments.  The Court's recitation does not recount <u>all</u>

4

the details of the Detectives' investigation, especially because the parties did not recite these details themselves in their briefs.[5]

In the mid-1990s, Mitchel Periandri, Tracy Mora, and Wendy Sporcich were all co-workers at a company called Ethan Allen. In 1995, Mora and Sporcich filed a sexual harassment case against Mitchel and Ethan Allen. Shortly thereafter, Mora reported to her local police department that she had received two threatening notes, and she suspected they were from Mitchel. Mora's suspicion, however, could not be proved. Mora later moved to a new house, and she did not receive any further threats for several years.

This situation changed in 2000. In November of 2000, Mora and Sporcich were both deposed in their sexual harassment lawsuit. Mitchel, whom Mora had not seen in years, was present at Mora's deposition. Mitchel's girlfriend/fiancé, Bowman, also appeared at Mora's deposition. Shortly after

---

[5] In her brief in opposition to summary judgment, Bowman set forth no recitation of material facts. Although she "incorporated" the briefs and exhibits filed by the other plaintiffs, the factual recitations in those briefs discuss hardly any of the facts relevant to Bowman; nowhere in these other briefs, for example, is made clear even the critical and simple fact of when Bowman was arrested. The Court did uncover some of the facts relevant to Bowman during its review of the many exhibits filed by the parties, but "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing Frito-Lay, Inc. v. Willoughby, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). Given that the non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact, Fulson v. City of Columbus, 801 F. Supp. 1, 4 (S.D. Ohio 1992), Bowman's failure to discuss the facts makes even more appropriate the Court's entry of summary judgment against her.

Furthermore, unfortunately, Bowman's failure was shared, to some degree, by every other party, including the defendants. That the factual record is complex, even convoluted, makes even more necessary a complete discussion by the parties of what happened and when. None of the parties fully tackled this task. As regards the defendants, for example, while they explain in detail the facts supporting their decisions to arrest and prosecute Mitchel, they do not set out individual analyses for the other plaintiffs. Thus, the defendants do not explain anywhere how the facts provide any underpinning to support probable cause for the arrest of Renee Seese. It is partly because of this failure that the Court concludes it must deny, in part, the defendants' motions for summary judgment.

they were deposed, Mora and Sporcich both began to receive telephone and letter threats. Sporcich, for example, reported that she received telephone calls from Mitchel, who threatened to kidnap her children. Mora found a sheet of wood left at her house, on which was painted the message "Tracy shut your mouth or die, Mitchel raped you, so what, move on, I fuckin saw, so what, drop the charges or die, cool." Both Mora and Sporcich believed these threats came directly or indirectly from Mitchel, and their civil attorney reported these threats to law enforcement authorities.

The Cuyahoga County Sheriff's Department assigned defendant Detective Quirino to investigate. During his investigation, Mora told Detective Quirino that Mitchel had drugged her and raped her six years earlier, in the spring of 1994. Mora further stated that Mitchel had also raped her friend and co-worker, defendant Wendy Sporcich. Finally, Mora stated that, in 1994, Bowman had threatened her repeatedly, accusing her of stealing her boyfriend, Mitchel. In December of 2000, Detective Quirino interviewed Sporcich, who made similar allegations: Mitchel had drugged her and raped her, and both he and Bowman had later threatened her. Neither Mora nor Sporcich had reported these allegations to law enforcement previously.

Detective Quirino undertook further investigation of Mitchel and discovered Mitchel had been accused in 1999 of raping a 17-year-old girl named Chiara Egizio. After an investigation, however, the grand jury had declined to indict Mitchel. Detective Quirino obtained the prosecutor's file for the Egizio case and learned that Chiara was hearing impaired and had a learning disability, but was able to sign and speak English as a second language. The file further revealed that Chiara's mother, Antoinette, had made the rape complaint after she learned her then-17-year-old daughter was having sex with Mitchel. Although Chiara had stated the sex was consensual, Chiara's mother had insisted her daughter's disabilities made her unable to consent to sexual contact. Detective Quirino contacted

6

Antoinette and asked her again about the 1999 rape case. Antoinette told him substantially the same story as when she first made the complaint in 1999, but also showed Detective Quirino Chiara's scores from the Gallaudet University Diagnostic test; these scores showed a fourth grade reading level. Detective Quirino also spoke with Chiara, who stated she did have consensual sex with Mitchel in 1999, and added that they had moved in together in October of 2000.

After speaking with Chiara and her mother, Detective Quirino became convinced that – even though the grand jury had earlier returned a "no bill" – Mitchel had, in fact, violated Ohio Rev. Code §2907.02(A)(1)(c), which prohibits sexual conduct with a person whose ability to consent is substantially impaired. Accordingly, Detective Quirino helped bring the case before the Cuyahoga County grand jury again, on February 7, 2001. Detective Quirino testified that Chiara was "obviously mentally retarded," and suggested her mental condition impaired her ability to consent to sexual contact. Detective Quirino also told the grand jury that, after examining the case file in existence before he re-opened the investigation, he could not understand why the case was "no billed," and that was why he had investigated further. Unlike before, the grand jury was presented with evidence of Chiara's test scores. On February 7, 2001, the grand jury issued a true bill and an indictment issued against Mitchel for two counts of rape of Chiara Egizio. In conjunction with the indictment, a warrant for Mitchel's arrest also was issued.

On February 9, 2001, Detective Quirino submitted an affidavit in support of a search warrant for Mitchel's home. Detective Quirino wanted to search for evidence regarding: (1) the alleged 1999 rapes of Chiara; (2) the threatening letters received by Mora in 2000; and (3) the alleged 1994 rapes of Mora and Sporcich. This affidavit noted specifically that Mora's and Sporcich's accounts of the 1994 rapes were consistent with having been surreptitiously given date rape drugs. The magistrate

7

issued the search warrant, and Detectives Quirino and Schilling acted on the warrant the next day. Specifically, in the early morning of February 10, 2001, the two Detectives entered Mitchel's home and found him sleeping in bed with Chiara Egizio. According to Mitchel, the two Detectives then dragged him out of bed and onto the floor, where they proceeded to kick him in the ribs and head, leading to the fracture of his sixth rib. The Detectives then took Mitchel to the Cuyahoga County Jail. On February 13, 2001, Mitchel was arraigned on the 1999 rape charge; his bond was set at $500,000, which he did not post.

On February 10, 2001, the same day the Detectives searched Mitchel's house, they also searched Bowman's house, pursuant to a search warrant. Although the evidence submitted by the parties does not make it clear, this warrant was apparently to search for evidence regarding the threatening letters received by Mora. The Detectives found Bowman's address book, which contained the home telephone number of "one of the victims" of the harassment, either Mora or Sporcich. Bowman, however, was not arrested at that time.

While Mitchel was in jail, Detectives Quirino and Schilling continued to investigate Mora's allegations regarding the 1994 rapes. On February 21, 2001, Mora and Sporcich both testified before a grand jury, and a six-count indictment for rape was returned against Mitchel on February 23, 2001. Mitchel was served with this indictment on February 28, 2001, while still in the County jail.

The man in the jail cell adjoining Mitchel's was Clay Krcal. On February 26, 2001, Krcal told Detective Schilling he had learned, from Mitchel, that Mitchel had directed his brother, Dante, to harm Mora. Krcal also told Schilling that, on February 24, 2001, Mitchel had been visited by his mother, Charline Cossu, in jail. At that time, Mitchel had told his mother to tell Dante to "finish  the plumbing job." Krcal explained that, according to Mitchel, Dante would know that the "plumbing job" referred

8

to the plan to harm Mora.  Finally, Krcal told Detective Schilling that Mitchel had stated he and Bowman were receiving tips about Schilling's own investigation from four other Cleveland Police Officers.

On February 27, 2001 – the day after Krcal spoke with Detective Schilling – Mora was found badly beaten and lying next to her car in a supermarket parking lot in Brookpark, Ohio.  She was taken to the emergency room, where an examination revealed many bruises on her face, arms, and body, as well as a ligature mark around her neck.  Mora also tested positive for amphetamines.  Brookpark police interviewed Mora, who stated she had driven to the drugstore to get diapers, but was attacked in the parking lot by one man and one woman wearing face masks.  The man forced her to eat something bitter, which eventually made her pass out, but she remembered parts of her assault, including being choked with a cord or wire.  Mora was sure that the man had blue or gray eyes, and that, while choking her, he had said "for my brother."  Mora thought the man looked and sounded like Mitchel Periandri; in fact, she believed he was Mitchel, until she was told Mitchel was in jail.  Mora identified the woman only as being thin and having light brown hair.

In the early morning of February 28, 2001, within hours of Mora's statement to the Brookpark police, Detectives Quirino, Schilling, and other members of the County Sheriff's Department went to the homes of Bowman, Marco, Gino, and Dante.  Although they did not have warrants, the officers arrested Bowman, Marco, and Gino, and also Jerome, who was staying in Dante's house.  Dante's wife, Renee Seese, told Detective Quirino that Dante was not home, so Detective Quirino directed her to tell Dante to call him when he returned.  Dante did call Detective Quirino when he returned home; the officers then returned and arrested Dante, and arrested Renee, as well.  The officers also seized Renee Seese's vehicle, which Dante had been driving that evening.  On the morning of February 28, 2001,

9

shortly after all of his relatives were arrested, Mitchel Periandri was arraigned under the previously-issued indictment for the 1994 rape charges.  Mitchel was denied bond, and the bonds for Gino, Marco, Dante, and Bowman were all set at more than $2 million.

On March 1 and 2, 2001, Dante, Marco, Gino and Jerome Periandri, and also Bowman and Renee Seese, were all released from custody without charges.  Within hours, however, arrest warrants were issued for Dante, Marco, Gino and Jerome (but not Renee).  The men turned themselves in voluntarily, and were again placed in jail.[6]  On March 12, 2001, pursuant to indictment, Dante, Marco and Gino, along with Bowman, were charged with attempted murder, kidnapping, and other crimes related to the February 27th Mora attack.  On the same date, pursuant to indictment, Jerome was charged with obstruction of justice by hindering the prosecution of Dante.

During this same time frame, the police officer defendants conducted searches of the homes of Dante and also Charline Cossu, the Periandri brothers' mother, pursuant to search warrants.  A gun was found in Gino's bedroom.  Because Gino had a prior conviction for domestic violence, he was later charged with possession of a handgun while under disability.

On March 2, 2001, before any of the Periandris were "re-arrested," Detectives Quirino and Schilling spoke with Mora again about the February 27th attack.  At that time, Mora stated there were at least four attackers, three men and a woman, and one of them had strangled her with a phone wire.  This was different from her earlier statement, when she had mentioned only two attackers.  Mora also told the Detectives that some of her attackers referred to each other by the names "Marco" and "Kathy." Mora then identified Marco, Gino, and Dante as her attackers from a photo lineup, despite her statement that her attackers all wore masks.  She also continued to maintain that her attackers had blue eyes,

---

[6] Although it is not clear, the Court presumes Bowman was also released and re-jailed.

10

although all of the Periandris have brown eyes.

Over the next several days, the case took a number of twists and turns.  On March 5, 2001, Mitchel's jail-mate, informant Krcal, gave Detectives Quirino and Schilling some notes he had written. In these notes, Krcal recorded alleged statements made by Mitchel to Krcal and others in the jail, where Mitchel described his alleged rape of Mora and Sporcich.  Krcal also gave the police officers some letters, purportedly written by Mitchel; Krcal explained that Mitchel had asked him to mail the letters because Mitchel believed jail personnel were screening letters that Mitchel mailed himself.  The letters called upon a number of people – including various Periandri family members, Kathy Bowman, and a man named Antonio Delgado – to kill defendants Mora and Sporcich.  The documents also revealed an alleged plot to kill Detective Quirino, possibly by hiring Delgado.  Finally, the documents reflected an alleged plot by Mitchel to intimidate Mora, by harming her stepdaughter.  The Detectives sent these letters to a forensic document examiner to determine if they were actually written by Mitchel. Separately, on March 5, 2001, several individuals stated to Detective Quirino that Gino had been with them at an Alcoholic Anonymous meeting at the time of Mora's attack.

Later that same day, Detective Quirino was walking to his car when he came to believe he was being followed by an Hispanic male, wearing glasses.  After slowing and turning several times, and seeing the male attempt to hide his face, Detective Quirino became certain he was being followed.  The next day, March 6, 2001, Detective Quirino acquired a photograph of Delgado, and was "97% sure" Delgado had been the person following him the previous day.  On March 7, 2001, Delgado was arrested, pursuant to a warrant; he immediately protested he did not even know any of the Periandris or Detective Quirino, nor had he ever followed or stalked Detective Quirino.  On March 8, 2001, the Detectives searched Delgado's home and uncovered an address book with Quirino's name in it.  The

11

next day, Detective Quirino obtained statements from both Mora and from Sporcich's husband, who said they had seen Mitchel and Delgado together in the past.  Detective Quirino also interviewed Delgado, who referred to details of the Mora attack that were not publicly known.  On March 12, 2001, the grand jury returned an indictment charging Delgado and Mitchel with conspiring to murder Detective Quirino.  Delgado's bond was set at $1 million.  During his first few days in jail, Delgado did not receive the daily insulin shots he needed, despite his requests for them.  Because he has proliferative diabetic retinopathy, Delgado suffered pain and poor vision.

About a week or so later, in mid-March, another jail-mate of Mitchel – Tim Lanum, Krcal's cell-mate – contacted law enforcement authorities and echoed many of Krcal's statements.  Specifically, Lanum stated he overheard Mitchel engaged in telephone conversations with Bowman and with other Periandris, during which he discussed the prospect of intimidating Mora through violent means.  Also, at about this time, Ray Lestock, a jail-mate of Gino Periandri, contacted law enforcement authorities.  Lestock stated he had overheard Gino saying that: (1) he (Gino), Dante, Marco, and Bowman had all abducted Mora, assaulted her in a garage, and dumped her in a parking lot, in retaliation for Mora's having brought charges against Mitchel; and (2) they had all arranged for other people to provide them with an alibi, by testifying they were at an Alcoholics Anonymous meeting at the time.  Separately, the Detectives learned through examining telephone records that the Periandris and Bowman had all communicated with each other on the day of, and the day before, the attack against Mora.[7]

On March 7, 2001, over one week after the alleged attack, Mora appeared at Summa Hospital

---

[7] In their depositions in this case, Gino, Marco, Dante, and Bowman all either denied this was true or could not recall talking to each other.

in Akron and showed medical staff what appeared to be the names of one or more of the plaintiffs scratched into her skin on her buttocks and vaginal areas.  Mora asserted she had not noticed these markings earlier.  These markings were not discovered during her emergency room visit immediately after the attack.

Marco, whose bond had been set at $2.5 million, proceeded to file a petition for writ of habeas corpus, seeking a reduction of his bond amount.  This petition was eventually granted on April 19, 2001, when the Ohio Court of Appeals found his bail amount was excessive and ordered it reduced to $150,000.  Shortly thereafter, the state court granted "preemptive" motions made by the Cuyahoga County prosecutor to reduce the bond amounts for the other alleged co-conspirators (e.g., Bowman's bond was reduced from $7 million to $150,000, and Delgado's bond was reduced from $1 million to $50,000).  At about this time, the Detectives spoke with an informant, who said Mitchel had stated that he had also hired Antonio Alvarez to kill the Detectives and other witnesses.  Alvarez, like Delgado, was Hispanic.  The Detectives tried to locate Alvarez to interview him, but did not succeed.

On May 16, 2001, the document examiner reported back to the two Detectives regarding the documents Krcal had supplied to them.  The document examiner concluded that, although the writing on the letters was consistent with Mitchel's handwriting, forgery by Krcal could not be ruled out.  The Detectives were concerned because they knew that Krcal had a criminal history that included a charge of forgery.  The Detectives also knew that Krcal and Delgado had spent time in jail together.  On May 16, 2001, the charge against Delgado was dismissed without prejudice.  Since that time, Delgado has received counseling and treatment for stress and paranoid schizophrenia.

As their investigation continued, Detectives Quirino and Schilling learned that Mora and Mitchel apparently were not merely ex-co-workers.  Earlier, Mitchel had asserted that he and Mora had

13

enjoyed a consensual sexual relationship in the 1990s, and that they had taken a trip together to North Carolina, so that Mitchel could buy a car there.  In June of 2001, the Detectives discovered information supporting Mitchel's claim.  They interviewed Mora's ex-husband, who told them that Mora had taken a business trip to North Carolina on June 18, 1994.  The Detectives then determined that Mitchel had purchased a car in North Carolina on the same date.  When the Detectives asked Mora about it, she denied that the North Carolina trip ever took place.  On June 22, 2001, the Detectives interviewed Sporcich, who stated that Mora and Mitchel did have a consensual relationship that lasted about three months.  Sporcich also stated that Mora had gone to North Carolina with Mitchel.  Sporcich explained she had earlier withheld this information from the Detectives because Mora had threatened to tell the Detectives about Sporcich's husband's marijuana sales, if Sporcich revealed Mora's earlier consensual relationship with Mitchel.

At about the same time – mid to late June of 2001 – Mora modified her recollection of the night of her February 27th attack.  Specifically, Detectives Schilling and Quirino had repeatedly asked Mora how her attackers could have known she was going to leave the house to buy diapers, and how they could have known what store she would visit to buy them, so that they could lay in wait for her in the parking lot.  Mora had never given them a satisfactory response.  In mid-summer of 2001, however, Mora told the Detectives that she left her house not to get diapers, but because a woman had called and told her to meet her in the parking lot immediately, or harm would come to Mora's stepdaughter.  This and other changes in Mora's recollections gave increasing concern to the Detectives, so, in late July or early August of 2001, they asked Mora if she would take a polygraph examination.  Mora refused.

Because the inconsistencies in Mora's stories became increasingly glaring, in September and October of 2001, the Cuyahoga County prosecutor dismissed all of the indictments against Bowman

14

and all of the Periandris without prejudice.  At the time of dismissal, Mitchel had spent almost eight months in jail; Dante, Marco and Gino had spent about three months in jail; and Jerome had spent about 45 days in jail.  Bowman spent about 63 days in jail before she was able to post bond.

II.  Summary Judgment Standard.

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . . .

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the  matters stated therein . . . .  The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.  When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists.

15

Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970); White v. Turfway Park Racing Ass'n, Inc., 909 F.2d 941, 943-44 (6th Cir. 1990).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards.  Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict."  Id. at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 322.  Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact."  Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing Frito-Lay, Inc. v. Willoughby, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).  The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact.  Fulson v. City of Columbus, 801 F. Supp. 1, 4 (S.D. Ohio 1992).  The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts.  Id.

III. Claims Under 42 U.S.C. §§1985(3) and 1986.

In addition to asserting that each of the defendants deprived them of various constitutional rights in  violation of 42 U.S.C. §1983, discussed below, the plaintiffs also claim the defendants conspired together to deprive the plaintiffs of various civil rights, thereby violating §§1985(3) and 1986.  The defendants argue that the plaintiffs cannot prevail under these two statutes, as a matter of law.  The

16

Court agrees.

Section 1985(3) "provides a means of redressing a conspiracy to deprive an individual of rights guaranteed under the Constitution." Seguin v. City of Sterling Heights, 968 F.2d 584, 590 (6th Cir. 1992). In Browder v. Tipton, 630 F.2d 1149 (6th Cir. 1980), however, the Sixth Circuit Court of Appeals made clear that the "equal protection of the laws" language of §1985(3) protects only the "so-called 'discrete and insular' minorities that receive special protection under the Equal Protection Clause because of inherently personal characteristics." Id. at 1150. That is, the Court of Appeals held that §1985(3) only covers conspiracies against: (1) classes who receive heightened protection under the Equal Protection Clause; and (2) those individuals who join together as a class for the purpose of asserting certain fundamental rights. Bartell v. Lohiser, 215 F.3d 550, 559-60 (6th Cir. 2000) (quoting Browder); see Seguin, 968 F.2d at 590 ("[t]he plaintiffs in this case did not allege, or prove, that they were members of a 'discrete and insular' minority which are accorded 'special protection under the Equal Protection Clause because of inherent personal characteristics'").

In this case, none of the plaintiffs have alleged or adduced evidence suggesting that they belong to one of the minorities that receive special protection under the Equal Protection Clause, or belong to some other classification upon which "the Supreme Court has . . . conferred suspect or quasi-suspect status." Bartell, 215 F.3d at 560. Thus, the plaintiffs cannot prevail on a claim brought under §1985(3), as a matter of law.[8] Furthermore, "to the extent that [the plaintiffs'] claims under section 1985(3) have failed, [their] claims under 42 U.S.C. §1986 must also fail. Section 1986 imposes liability on those individuals who have knowledge of any of the wrongs prohibited by section 1985, yet fail to prevent

---

[8] Although Delgado has asserted he is Hispanic, he does not in any way tie this assertion to his §1985 claim. That is, Delgado does not suggest anywhere that the defendants conspired to deprive him of his civil rights because he was Hispanic.

them.  Without a violation of section 1985(3), there can be no violation of section 1986."  Seguin, 968

F.2d at 590; see Bartell, 215 F.3d at 560 ("there can be no violation of §1986 without a predicate

violation of §1985").  Accordingly, the defendants are entitled to summary judgment on all of the

plaintiffs' claims brought under §§1985(3) and 1986.


IV. Claims Under §1983 and Qualified Immunity.

        The plaintiffs assert that the defendants' actions infringed their Fourth Amendment rights to be

free of arrest, search and seizure, and prosecution, absent probable cause.  Among other defenses,

defendants Quirino and Schilling assert they are entitled to qualified immunity.

        Government officials performing discretionary functions have qualified immunity from civil

suits for damages arising out of the performance of their official duties, if their actions could reasonably

have been thought consistent with the rights they are alleged to have violated.  Adams v. Metiva, 31

F.3d 375, 386 (6th Cir. 1994); see also Anderson v. Creighton, 483 U.S. 635, 638 (1987).  "The key

inquiry in analyzing a claim of qualified immunity is whether the defendant's alleged conduct violated

clearly established statutory or constitutional rights of which a reasonable person would have known."

Adams, 31 F.3d at 386; see also Anderson, 483 U.S. at 638-40; Harlow v. Fitzgerald, 457 U.S. 800, 818

(1982).

        When a motion for summary judgment is based on qualified immunity, a plaintiff must

effectively pass two hurdles:

        First, the allegations must state a claim of the violation of clearly established law.  Second, the
        plaintiff must present evidence sufficient to create a genuine issue as to whether the defendant
        in fact committed the acts that violated the law.  Both are questions of law for the court to
        decide.

Adams, 31 F.3d at 386 (citing Russo v. City of Cincinnati, 953 F.2d 1036, 1043 (1992)).  The ultimate

18

burden of proof is on the plaintiffs to show that the defendants are not entitled to qualified immunity.

Wegener v. City of Covington, 933 F.2d 390, 392 (6th Cir. 1991).  The defendants bear the initial

burden of coming forward with facts to suggest that they were acting within the scope of their

discretionary authority during the incident in question.  Id.  Thereafter, the burden shifts to the plaintiffs

to establish that the defendants' conduct violated a right so clearly established that any official in

defendants' positions would have clearly understood they were under an affirmative duty to refrain

from such conduct.  Id.  "Objective legal reasonableness" is the touchstone of this determination.

Anderson v. Creighton, 483 U.S. 635, 639 (1987).  That is, for a right to be clearly established, "[t]he

contours of the right must be sufficiently clear that a reasonable official would understand that what

he is doing violates that right."  Id. at 640.  Thus, this standard demands that the "right must be

sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful."

Centanni v. Eight Unknown Officers, 15 F.3d 587, 589-90 (6th Cir. 1994), cert. denied, 512 U.S. 1236

(1994) (quoting Azeez v. Fairman, 795 F.2d 1296, 1301 (7th Cir. 1986)); see Anderson, 483 U.S. at 640

("in the light of pre-existing law the unlawfulness must be apparent").

A court must be mindful, however, that

summary judgment would not be appropriate if there is a factual dispute (i.e., a genuine
issue of material fact) involving an issue on which the question of immunity turns, such
that it cannot be determined before trial whether the defendant did acts that violate
clearly established rights. . . .  Summary judgment also should be denied if the
undisputed facts show that the defendant's conduct did indeed violate clearly
established rights.  In either event, the case will then proceed to trial, unless the
defendant takes a successful interlocutory appeal on the issue of qualified immunity.

Poe v. Haydon, 853 F.2d 418, 426 (6th Cir. 1988), cert denied, 488 U.S. 1007 (1989) (citations omitted).

Accord, Brandenburg v. Cureton, 882 F.2d 211, 215-16 (6th Cir. 1989).

19

The Court now examines the plaintiffs' claims in light of these standards.[9]

A. Fourth Amendment Claims.

The plaintiffs assert that various defendants deprived them of certain Fourth Amendment rights – that is, the rights to be free from arrest, seizure, prosecution, and imprisonment, absent probable cause.  The defendants respond that, because the plaintiffs were all arrested pursuant to warrant and/or indicted, probable cause existed as a matter of law.  As to most, but not all, of the plaintiffs and their specific claims, the Court agrees.

The defendants are correct that an arrest, seizure, prosecution, or imprisonment based on probable cause does not violate the Fourth Amendment.  See Michigan v. DeFillippo, 443 U.S. 31, 36 (1979).  That is, the existence of probable cause provides a complete defense to a §1983 claim predicated on arrest or prosecution without probable cause.  The defendants argue that, since the arrests and prosecutions of the plaintiffs were pursuant to warrants and indictments, probable cause necessarily existed and all of the §1983 claims predicated on the Fourth Amendment must fail.

"[I]t has long been settled that 'the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause for the purpose of holding the accused to answer.'"  Bakos v. City of Olmsted Falls, 2003 WL 21995427 at *5 (6th Cir.

_____

[9]  The Court first examines below the claims made by all plaintiffs except Delgado.  In section VI of this opinion, the Court examines Delgado's claims separately.

20

Aug. 19, 2003) (quoting <u>Ex parte United States</u>, 287 U.S. 241, 250 (1932)).[10]  In the face of an indictment, a plaintiff may only show that probable cause did not exist by producing substantial evidence to establish of irregularity in the grand jury process itself.  <u>Id.</u>  A plaintiff may carry this burden only by showing that the return of the indictment resulted from perjured testimony or that the grand jury proceedings were otherwise significantly irregular.  <u>Washington v. City of Cleveland</u>, 948 F. Supp. 1301, 1306-07 (N.D. Ohio 1996) (citing <u>Deoma v. Shaker Heights</u>,68 Ohio App.3d 72 (Ohio Ct. App. 1990), and <u>Adamson v. The May Co.</u>, 8 Ohio App.3d 266 (Ohio Ct. App. 1982)).  If "[t]here is no evidence of perjured testimony or irregularity in the grand jury proceeding so as to indicate that the indictment was somehow tainted," then the defendants are "entitled to a conclusive presumption that there was probable cause to support the arrest of Plaintiffs."  <u>Bakos</u>, 2003 WL 21995427 at *5.

A police officer has probable cause if there is a "fair probability" that the individual to be arrested has either committed or intends to commit a crime.  <u>Northrop v. Trippett</u>, 265 F.3d 372, 379 (6th Cir. 2001) (quoting <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989)).  Probable cause to justify an arrest "means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense" <u>DeFillippo</u>, 443 U.S. at 37.  "In general, the existence of probable cause in a §1983 action presents a jury question, unless there is only

---

[10]  Although <u>Bakos</u> is not a reported case, the Sixth Circuit Court of Appeals follows the "general principle that, although not binding, unreported Sixth Circuit decisions can be cited if persuasive."  <u>In re Hess</u>, 209 B.R. 79, 82 n.3 (6th Cir. BAP 1997).  This Court cites <u>Bakos</u> both because: (1) it was an appeal of a decision rendered by the undersigned; and (2) the facts in <u>Bakos</u> suggested the defendants had committed perjury before, and submitted false evidence to, a grand jury, but the appellate court still found that the defendants enjoyed qualified immunity.  Here, there is virtually no evidence of irregularity in the grand jury proceedings or of improper governmental conduct in connection with those proceedings.

one reasonable determination possible." <u>Pyles v. Raisor</u>, 60 F.3d 1211, 1215 (6th Cir. 1995).  However, it is settled that even law enforcement officials who reasonably but mistakenly conclude that their actions are legal are entitled to immunity.  <u>Hunter v. Bryant</u>, 502 U.S. 224, 226 (1991).

### 1. Arrest of Mitchel for the Rape of Chiara Egizio.

Mitchel argues that probable cause did not exist to support his arrest for the rape of Chiara Egizio.  Mitchel notes that: (1) when evidence of the supposed rape was first presented to the grand jury, it was "no-billed;" (2) Chiara repeatedly stated she had consented to having sex with Mitchel; (3) Chiara had actually moved in with Mitchel at the time Detective Quirino re-opened the investigation; and (4) the only reason Chiara scored poorly on standardized testing was because she was deaf.  Mitchel insists this evidence shows clearly that he never had sex with Chiara against her will, and he goes so far as to assert that Detective Quirino presented false and misleading evidence to the grand jury to obtain an indictment.

Mitchel's argument that probable cause did not exist, however, is completely undercut by the fact that the grand jury issued an indictment.  Unless Mitchel can show that this indictment resulted from perjured testimony, or that the grand jury proceedings were otherwise significantly irregular, probable cause exists as a matter of law.  <u>Bakos</u>, 2003 WL 21995427 at *5.  In this case, it is irrelevant that the first grand jury did not return an indictment.  The second one did, presumably because Detective Quirino presented <u>additional</u> evidence – test scores evidencing that Egizio's ability to consent to sex was impaired.  It is also irrelevant that Chiara stated she had consented, and that she later moved in with Mitchel, because the critical question was whether Chiara had the mental capacity in 1999 to consent in the first place.  The grand jury concluded that probable cause existed to show she did not

have this mental capacity.  Further, upon reading all of the grand jury transcript portions presented by the parties, the Court easily concludes that the entirety of Detective Quirino's testimony was in no way false or misleading.  It may not have been entirely accurate for Detective Quirino to label Chiara as "mentally retarded" – the only statement that Mitchel asserts was perjurious – but Detective Quirino did not mis-state the various evidence upon which he based his conclusion that Chiara had a limited mental capacity and had an impaired ability to give consent.  Furthermore, Detective Quirino's agreement with the prosecutor's characterization of Chiara as "mentally retarded" was not unreasonable, and police officers who make reasonable but mistaken conclusions remain entitled to qualified immunity.

Put simply, as a matter of law, based on the undisputed facts, Mitchel cannot demonstrate a violation of his Fourth Amendment rights in connection with his arrest for the rape of Chiara, because the arrest was supported by probable cause.  Accordingly, the Court may end its qualified immunity analysis here.  See Saucier v. Katz, 533 U.S. 194, 201 (2001) (if no constitutional right was violated, then "there is no necessity for further inquiries concerning qualified immunity").

### 2. Re-arrests of Marco, Gino, Jerome, Dante, and Bowman.

As outlined above, in the early morning of February 28, 2001, just after Mora was found beaten up, the police arrested Bowman, Marco, Gino, Jerome, Dante, and Renee.  (The Court addresses the legality of these initial arrests in section IV.A.3, below.)  On March 1 and 2, 2001, all six of them were released from custody without charges.  Within hours, however, arrest warrants were issued for Dante, Marco, Gino and Jerome (but not Renee).  The men turned themselves in voluntarily, and were again

placed in jail.[11]  Dante, Marco and Gino, along with Bowman, were charged with attempted murder, kidnapping, and other crimes related to the Mora attack.  Jerome was charged with obstruction of justice by hindering the prosecution of Dante.

Prior to the time the warrants issued for the re-arrest of Dante, Marco, Gino, and Jerome, Mora had spoken twice with various police officers about the February 27, 2001 attack: (1) on February 28th, just after the attack occurred, Mora spoke with the Brookpark police; and (2) on March 2nd, Mora spoke with Detectives Quirino and Schilling.  The Periandris point out that there were a number of serious inconsistencies between the stories Mora told during these two interviews.  The most glaring example is that Mora initially told the Brookpark police officers she was attacked by one man and one woman, but later told Detectives Quirino and Schilling she was attacked by at least four people, including three men and a woman.  The Periandris also point out that, during both interviews, Mora described the male attackers as having blue or gray eyes, while all of the Periandris have brown eyes.  The Periandris insist that, when they were re-arrested, the sum of the information given by Mora to the police officers was so implausible, suspicious, and unreliable, that no reasonable police officer could have believed probable cause existed.  The Periandris explain:

> The basis of  Plaintiffs' claim for these unlawful arrests is that Plaintiffs were arrested without probable cause, despite warrants.  The clear absence of probable cause indicates that the warrants were obtained from a biased magistrate who merely acted as a rubber stamp, or that false and misleading information was included in the affidavits for the arrest warrants.  * * *  Unfortunately, Plaintiffs have not been provided with these affidavits, and therefore cannot indicate the specific false and misleading statements.

---

[11]  To repeat: although it is not clear, the Court presumes Bowman was also released and re-jailed.  Bowman's failure to set out any recitation of the facts (and, thus, her complete failure to carry her burden of showing a lack of probable cause) makes the Court's conclusion (that the arrests and re-arrests of Marco, Gino, Jerome, and Dante were not illegal) even more applicable to Bowman.

24

Response br. at 16 n.5.[12]

Although hindsight did prove that the number of inconsistencies in Mora's stories would only increase, the Periandris' argument is still unpersuasive. The Sixth Circuit has warned that, when assessing a state magistrate's determination of probable cause in issuing a search warrant, this Court must pay "great deference" to the magistrate's findings, which "should not be set aside unless arbitrarily exercised." United States v. Leake, 998 F.2d 1359, 1363 (6th Cir. 1993). It is true that the magistrate must not serve merely as a "rubber stamp" for the police; he must perform his function in a neutral and detached function. But, so long as "the magistrate had a substantial basis for concluding" that a crime had been committed, had "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion," that the defendant had committed a crime, then this Court will not void the magistrate judge's conclusion. United States v. Sonagere, 30 F.3d 51, 53 (6th Cir. 1994); United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990); see United States v. Kincaide, 145 F.3d 771, 779 (6th Cir. 1998), cert. denied, 525 U.S. 1166 (1999).

Because the parties have not introduced into evidence the statements made by the Detectives in support of issuance of the warrants, the Court's analysis is, to some degree, made in a vacuum. But the record does show that, when they went before the magistrate seeking arrest warrants, Detectives Quirino and Schilling had received the following critical pieces of information from Mora: (1) she

---

[12]    In fact, the Detectives did earlier file with the Court copies of at least some of the affidavits and arrest warrants. See docket no. 95, exhibits 11, 15 (exhibits 12-14 are missing) and docket no. 111. It is unclear, however, whether these affidavits, which are bare of any particularized facts, were the sole source of evidence offered in support of the warrants; the affidavits are signed by the clerk of court, not any police officer, and recite that Detective Schilling made a "complaint upon oath" before the state court. In any event, there is no evidence in the record before the Court that shows Detectives Schilling or Quirino made a false statement to support issuance of an arrest warrant.

knew Mitchel, and was already suing him for sexual harassment; (2) she had received threats from Mitchel and Bowman, both in 1994 and in the immediate past few weeks; (3) two of her attackers had referred to each other as "Marco" and "Kathy;" and (4) she picked Marco, Gino, and Dante out of a lineup. Equally important, the Detectives gained most of this information <u>after</u> hearing from informant Clay Krcal a prediction that the attack would occur – on the day before Mora was attacked, Krcal had told Detective Schilling that Mitchel had directed Dante to harm Mora. And, the Detectives knew that Mora believed she had been drugged, possibly explaining some of the inconsistencies in her story.[13]

It is essential to remember that this Court must assess the magistrate's probable cause determination <u>at the time it was made</u>, in light of the information <u>then known</u>. It is irrelevant that additional inconsistencies in Mora's stories appeared months later. At best, the Periandris have shown the Court should infer that the information the Detectives presented to the magistrate contained false information <u>provided by Mora</u>; there is no support for an inference that the Detectives, themselves, knew any information they provided was false. And, of course, the burden is on the plaintiffs to show the Detectives knowingly provided false information, or the magistrate did not perform his role in a neutral and detached fashion. The plaintiffs have failed to carry their burden.

Notably, the Court's analysis to this point applies primarily to the re-arrest of Dante, Marco, Gino, and Bowman, who were charged with engaging in the Mora attack. The analysis is somewhat

---

[13]  The Periandris note that, after her attack, Mora was found to have amphetamines in her blood, which would normally make Mora <u>more</u> attentive. But the Detectives also knew that: (1) Mora's prior descriptions of the alleged 1994 rape were consistent with having been given a date-rape drug, which would cloud Mora's memory; (2) Mora stated she had been forced to eat something bitter when she was attacked, and she then felt knocked out; and (3) the Detectives interviewed her soon after the attack, when any "knock-out drugs" might still be working. It is possible that Mora was given a "knock-out drug" at the beginning of her attack and an amphetamine "wake-up drug" at the end. In any event, the Periandris' argument that the presence of amphetamines in Mora's blood undercuts the Detectives' conclusion of probable cause is unavailing.

different as to Jerome, who was charged only with obstruction of justice by hindering the prosecution of Dante. The parties do not undertake a separate analysis of Jerome, but the Court notes the Detectives had far less information connecting him with any crime; whereas Mora had picked out the other three Periandri brothers as her attackers, it is unclear what evidence the Detectives might have offered supporting the proposition that Jerome obstructed justice. None of the parties point to an affidavit or deposition testimony or <u>any</u> evidence on this point, except to indicate that Jerome may have provided a false alibi for Dante, or attempted to do so, for the night of the attack.

Once again, the Court concludes it must resolve this factual ambiguity in favor of the Detectives, because the burden of showing illegality rests on Jerome. Given that a magistrate issued an arrest warrant, and that Jerome was subsequently indicted by a grand jury, the Detectives are "entitled to a conclusive presumption that there was probable cause to support the arrest of [Jerome]," unless Jerome can point to perjured testimony or some other irregularity. <u>Bakos</u>, 2003 WL 21995427 at *5; <u>see</u> <u>Higgason v. Stephens</u>, 288 F.3d 868, 877 (6th Cir. 2002) (fact of indictment showed probable cause, so that defendants were qualifiedly immune from claims of unconstitutional arrest). Jerome does not identify any evidence suggesting the Detectives presented the magistrate with perjurious averments, nor does Jerome identify any evidence of other irregularity. And the Court's own review of the evidence of record does not reveal any basis upon which to reverse the presumption that probable cause existed for Jerome's arrest. Thus, Jerome's claim that his re-arrest was unconstitutional cannot succeed, as a matter of law.

<u>3. Initial Arrests of Marco, Gino, Jerome, Dante, Renee, and Bowman</u>.

Marco, Gino, Jerome, Dante, Renee, and Bowman were all arrested initially on February 28,

27

2001, released, and then (except for Renee) re-arrested two or three days later.  The legality of the re-arrests was discussed immediately above.  The legality of the initial arrests requires a different analysis, for two reasons.  First, the initial arrests were not made pursuant to a warrant.  Thus, there is no legal presumption that probable cause existed.  Second, the quantum of information known to the Detectives at the time of the initial arrests was less than that known at the time of the re-arrests.  In other words, the information upon which the Detectives made their probable cause determination was different at the time of the initial arrests than at the time of the re-arrests, so the legality of the Detectives' first determination requires a different analysis.[14]

When the Detectives arrested the defendants on February 28, 2001, Mora had made only her first statement to the Brookpark police; she had not made her second, March 2, 2001 statement to the Detectives.  Thus, Mora had not picked Marco, Gino, and Dante out of a lineup, and she had stated only that there were two attackers, a man and a woman.  The Detectives did know, however, that: (1) Mora had stated that Mitchel and Bowman had harassed her and threatened her in the mid-1990s, but stopped after she changed addresses; (2) Mora's harassment resumed shortly after Mitchel and Bowman attended her deposition in her civil suit; (3) a recent search of Bowman's home had revealed evidence connecting her with either Mora or Sporcich; (4) the day before the attack, informant Krcal had stated he overheard Mitchel directing Dante to harm Mora; (5) Mora stated her male attacker had blue or gray eyes, and used the phrase, "for my brother;" and (6) when the Detectives arrived at Dante's house to arrest him, Renee and Jerome told the Detectives that Jerome and Dante had spent the last few

---

[14] In their briefs, the Detectives did not make this distinction, simply analyzing the "arrests." Essentially, the Detectives argued that, because the re-arrests were supported by probable cause, the initial arrests were also.  The plaintiffs point out correctly that the initial and subsequent arrests were separate events, and their legality must be assessed separately.

hours – including the period of time during which Mora was attacked – together, at various bars.

The Court notes again three guiding principles to its analysis: given the lack of a warrant or indictment, there is no presumption that probable cause exists; the existence of probable cause usually presents a jury question; and law enforcement officials who reasonably but mistakenly conclude that their actions are legal are entitled to immunity. In light of what the Detectives knew at the time they made their February 28, 2001 initial arrests, the Court easily concludes that, at the very least, qualified immunity does protect the Detectives from having to defend against the claims by Dante and Bowman. Bowman was an obvious suspect, given her history of threatening behavior toward Mora, her having received recent communications from Mitchel, and Mora's description of a woman attacker. No reasonable jury could conclude there was no probable cause to support the Detectives' arrest of Bowman, because there were "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Michigan v. DeFillippo, 443 U.S. 31, 37 (1979).

Further, even if there is some room for a jury to conclude that a question existed as to probable cause to arrest Bowman, the Detectives' conclusion that probable cause supported Bowman's arrest was clearly reasonable, given the facts known to them at the time. That is, the Detectives' decision to arrest Bowman was not objectively, legally unreasonable. Bowman has not offered "sufficient evidence to indicate that what [the Detectives] did was objectively unreasonable in light of the clearly established constitutional rights." Dean v. Byerley, 354 F.3d 540, 557 (6th Cir. 2004).

The same conclusion holds for the Detectives' arrest of Dante. Given that Mitchel had reportedly directed Dante to harm Mora only the day before she was actually beaten, and that the

attacker stated he was choking her "for my brother," no reasonable jury could conclude the Detectives' decision to arrest Dante was not premised on probable cause.  And, even if it could be said that a jury question exists, the Detectives are qualifiedly immune, because Dante has not shown the arrest was an objectively unreasonable mistake.  The information the Detectives had connecting Dante with Mora's alleged attack was substantial.

The probable cause analysis presents a much closer question with regard to Jerome; the information known to the Detectives that linked Jerome to the Mora incident was certainly not as substantial as the evidence linking the attack the attack to Dante or Bowman.  But the Detectives knew that Mitchel had directed Dante to harm Mora, that Jerome was at Dante's house, that the attacker stated he was acting "for my brother," and – most important – that Dante and Jerome both stated they had spent the entire evening together.  This information gave the Detectives reason to believe Jerome was involved with the Mora incident.  Whether this reason was strong enough to constitute probable cause does appear to be a jury question.  But the Court concludes that, even if a jury could reasonably find that the Detectives were mistaken in deciding probable cause existed to arrest Jerome, the Detectives' mistake was a reasonable one, so that qualified immunity attaches.  Put simply, probable cause existed to arrest Dante for having attacked Mora, and the Detectives knew Jerome had spent the night with Dante.  Like Bowman and Dante, Jerome has not adduced sufficient evidence to indicate that the Detectives' actions were objectively unreasonable in light of his clearly established constitutional

rights.[15]

On the other end of the spectrum is Renee Seese.  Even the doctrine of qualified immunity does not protect the Detectives against her claim.  The only evidence currently of record is that, when the Detectives arrived to arrest Renee's husband, Dante, they awoke Renee, who then cooperated with them completely.[16]  She answered all of the Detectives' questions, told them the license plate of the car Dante was driving, promised to have Dante call them when he returned, and kept her promise.  The Court can find no evidence at all suggesting that probable cause existed to arrest Renee for obstruction of justice.  Merely living with Dante is not enough.  A jury could reasonably conclude that the Detectives did not have probable cause to arrest Renee, and the Court is compelled to find that, as a matter of law, there is no evidence to support the argument that her arrest was a "reasonable mistake."

Finally, the Court must conclude that qualified immunity also does not protect the Detectives against the claims by Marco and Gino.  Unlike the case with Dante and Jerome, the Detectives have presented no evidence at all, known to them at the time of the initial arrests, linking Marco and Gino

---

[15]  Subsequent to Jerome's arrest, Mora identified her attackers as Gino, Marco, Dante, and Bowman – and not Jerome.  Thus, when Jerome was indicted on March 12, 2001, he was not charged with participating in the Mora attack; rather, he was indicted for obstruction of justice, by hindering the prosecution of Dante.  There was certainly probable cause for believing Jerome had engaged in this crime, because: (1) there was at all times probable cause to believe Dante participated in the attack upon Mora; (2) Jerome stated he and Dante had spent the night of the attack together, visiting bars; and (3) Jerome insisted Dante had not attacked Mora.  Thus, even if it is a "close question" whether the initial arrest of Jerome for attacking Mora was supported by probable cause, it is certain that the initial arrest of Jerome for obstruction of justice – the only crime with which he was later charged – was supported by probable cause.

[16]  In his deposition, Detective Quirino made a passing suggestion that he had a vague recollection that Renee had withheld information about her car or had somehow gotten "caught in a lie," but there is no detail given to support this assertion.  Depo. at 187.  The evidence adduced at trial may show that, in fact, probable cause existed to support Renee's arrest, or qualified immunity applies.  Given the evidence so far presented, however, Renee's claim must be allowed to go forward.

31

with the Mora incident.  Although Mora later told the Detectives that there were several male attackers and picked Marco and Gino out of a photo line-up, the Detectives did not have this information at the time of the original arrests.  And, the Court has been pointed to no evidence suggesting that the Detectives had any reason to believe the entire Periandri family shared in a conspiracy to harm Mora. Gino and Marco assert the Detectives arrested them only because they are Mitchel's brothers, and Mitchel had asked their <u>other</u> brother, Dante, to harm Mora.  A reasonable officer would know that it is unconstitutional to arrest a person merely because he shares a surname with a valid suspect.  Neither the clear existence of probable cause nor the doctrine of qualified immunity protect the Detectives against the claims by Gino and Marco.[17]

Accordingly, the Court concludes that summary judgment must be granted to the defendants on the claims by Dante, Jerome, and Bowman that their initial arrests were illegal.  But the Court further concludes that summary judgment must be denied on the claims by Renee, Gino, and Marco that their initial arrests were illegal, because a jury question exists and qualified immunity does not apply.[18]

---

[17] Again, the Court notes the evidence adduced <u>at trial</u> may show that, in fact, probable cause existed to support the arrests of Renee, Gino, and/or Marco, or qualified immunity applies.  There is some suggestion, for example, that informant Krcal may have provided the Detectives with information linking not only Dante, but also Gino and Marco, to the Mora attack.  <u>See</u> Myles depo. at 70-80 (Prosecutor Myles states vaguely that Detective Quirino learned from informant Krcal that "the brothers" and Bowman were going to hurt Mora).  But this suggestion is only indefinite, multi-level hearsay.  Given the evidence presented <u>so far</u>, the claims by Renee, Gino, and Marco must be allowed to go forward.

[18] Given that Renee, Gino, and Marco were all released a few days after their initial arrest, and that their <u>re-arrests</u> were not illegal, the maximum period of any illegal seizure was only 2 or 3 days.

32

4. Warrantless Entries.[19]

On February 28, 2001, shortly after the Mora attack, the Detectives went to the homes of Bowman, Marco, Gino, and Dante to effectuate the initial arrests discussed above.  At that time, although the Detectives did not have warrants, the officers entered the plaintiffs' homes.  The plaintiffs claim that each warrantless entry was an illegal search.

The Supreme Court has explained that a "basic principle of Fourth Amendment law" is that "searches and seizures inside a home without a warrant are presumptively unreasonable."  Payton v. New York, 445 U.S. 573, 586 (1980).  The Supreme Court went on to explain, in Welsh v. Wisconsin, 466 U.S. 740 (1984), the circumstances under which this presumption may fall away: warrantless arrests inside someone's home may be constitutionally permissible "upon a showing of probable cause and exigent circumstances, . . . limited to felony arrests."  Id. at 751 n.11 (emphasis added).[20]

The Sixth Circuit Court of Appeals, in turn, has addressed the meaning of exigent circumstances and "characterized the situations in which warrantless entries are justified as lying within one of four general categories: (1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, and (4) a risk of danger to the police or others."  United States v. Rohrig, 98 F.3d 1506, 1515 (6th Cir. 1996) (citing United States v. Johnson, 22 F.3d 674, 680 (6th Cir. 1994)).

---

[19]  The Court did not list these "warrantless entry" Fourth Amendment claims in the claims-chart attached to the Order dated February 24, 2000 (docket no. 110), but the plaintiffs' briefing makes clear that these claims were contemplated by all parties.

[20]  Below, the Court concludes that the Detectives are not entitled to summary judgment on plaintiffs' claims regarding warrantless entries because the Detectives make absolutely no showing that there existed exigent circumstances.  With regard to Gino and Marco, it is also true (as discussed above) that there exists a jury question whether the Detectives had probable cause to arrest at all, providing an additional reason to allow Gino's and Marco's §1983 claims premised on warrantless entries to go forward.

33

Further, the appellate court notes that "the burden is on the government to demonstrate exigency." United States v. Morgan, 743 F.2d 1158, 1162 (6th Cir. 1984); see Welsh, 466 U.S. at 750 (the police bear a "heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests").

In this case, Detectives Shilling and Quirino entered the homes of Bowman, Marco, Gino, and Dante, eventually arresting all of them, as well as Jerome and Renee.  At the time the officers entered the homes – early in the morning of February 28, 2001 – they were not in hot pursuit of anybody.  Nor is there any evidence that, if the officers did not immediately carry out the arrests, any evidence would be destroyed, a suspect would escape capture, or any person would be put into danger.  Indeed, the Detectives' briefs are completely silent regarding the issue of the warrantless entries, providing no argument as to why the entries did not violate the Fourth Amendment; this silence continues even in the Detectives' reply briefs.  Put simply, the Detectives offer absolutely no reason why they could not have obtained an arrest warrant or search warrant before entering the plaintiffs' homes and arresting them.

There can be no question that, based upon the applicable law, and viewing the facts currently of record in the light most favorable to the plaintiffs, a jury could reasonably find the Detectives committed a constitutional violation by entering the plaintiffs' homes without a warrant.  And, a reasonable officer should have known that doing so would violate a clearly established constitutional right: "the Fourth Amendment has drawn a firm line at the entrance to the house."  Payton, 445 U.S. at 590 (holding that the Fourth Amendment prohibits the police from making a warrantless and non-consensual entry into a suspect's home in order to make a routine felony arrest); see United States v. Morgan,  743 F.2d 1158, 1161 (6th Cir. 1984, cert. denied, 471 U.S. 1061 (1985) ("[a]bsent exigent

34

circumstances, police officers may not enter an individual's home or lodging to effect a warrantless arrest or search"). Any reasonable officer should know that, absent consent or exigent circumstances, a warrant is necessary before entering someone's home. "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." Rohrig, 98 F.3d at 1514. Further, the plaintiffs have "offered sufficient evidence to indicate that what the [Detectives] allegedly did was objectively unreasonable in light of the[se] clearly established constitutional rights." Dean, 354 F.3d at 557. Accordingly, qualified immunity does not protect the Detectives from this claim. Id. Because the Detectives have offered no argument justifying their warrantless entries into the homes of Bowman, Marco, Gino, and Dante, the plaintiffs' §1983 claims premised on illegal entry must be decided by a jury.

### 5. Entries Pursuant to Warrant.

In addition to challenging the warrantless entries discussed above, the plaintiffs also challenge the legality of three searches conducted by the Detectives pursuant to warrant: (1) the search of Mitchel's home on February 10, 2001, at which time they found Mitchel sleeping in bed with Chiara Egizio and arrested him for the 1999 rape of Egizio; (2) the March 1, 2001 search of the home of Charline Cossu, the Periandri brothers' mother, for information related to the February 27, 2001 attack on Mora; and (3) the March 1, 2001 search of Dante's home for information related to the attack on Mora. The plaintiffs argue that, in the three affidavits submitted to obtain the warrants to conduct these

35

searches, the Detectives provided material, misleading information to the magistrate.

As the Court noted above, "[i]n a civil rights case, investigators are entitled to rely on a judicially-secured arrest warrant as satisfactory evidence of probable cause." Yancey v. Carroll County, 876 F.2d 1238, 1243 (6th Cir. 1989).  However, "an officer cannot rely on a judicial determination of probable cause if that officer knowingly makes false statements and omissions to the judge such that, but for these falsities, the judge would not have issued the warrant." Id; see Ahlers v. Schebil, 188 F.3d 365, 373 (6th Cir.1999).  Thus, a police officer may be held liable under §1983 for making material false statements either knowingly or in reckless disregard for the truth, in an effort to establish probable cause in support of a warrant. Ahlers, 188 F.3d at 373.  To overcome an officer's entitlement to qualified immunity, "a plaintiff must establish: (1) a substantial showing that the defendant stated a deliberate falsehood or showed reckless disregard for the truth and (2) that the allegedly false or omitted information was material to the finding of probable cause." Vakilian v. Shaw, 335 F.3d 509, 517 (6th Cir. 2003).   "In other words, [the plaintiff] must show that the judge would not have issued the warrant without the allegedly false material." Id.  Thus, even if the plaintiffs do show that the Detectives misrepresented the evidence, that "does not end [the] inquiry . . .because [the Court] must also determine whether the false statements were material to the finding of probable cause." Id. at 518 (emphasis added).

In this case, the Court easily concludes both that: (1) the plaintiffs do not make a substantial showing that the Detectives showed a reckless (much less deliberate) disregard for the truth when they submitted their affidavits; and (2) even accepting the plaintiffs' argument that the Detectives recklessly omitted from their affidavits material information, the inclusion of the omitted material would not have changed the magistrate's conclusions that probable cause existed.

36

With regard to the affidavit supporting the search of Mitchel's house, the Court discussed the evidence supporting probable cause in section IV.A.1, above.  Mitchel asserts that Detective Quirino failed to inform the magistrate that: (1) Mora and Sporcich had waited six years to report that Mitchel had raped them; (2) there was "no physical evidence" linking Mitchel to the threatening notes Mora received; and (3) Chiara was not "mentally retarded," and other evidence showed she had sufficient mental capacity to consent to sex.  An examination of the affidavit shows the first assertion is not true – Detective Quirino noted that "the attacks described by the victims occurred during the spring and summer of 1994."  Exh. N, affid. at A-4.  Further, the second and third assertions are immaterial – while there was no "physical evidence" linking the threatening notes to Mitchel, there was plenty of other evidence of Mitchel's threatening behavior, and the affidavit accurately portrays the evidence of Chiara's diminished mental capacity.  Mitchel has not shown Detective Quirino displayed any disregard for the truth in his affidavit, and it is extremely likely that the magistrate judge would have issued the warrant even if the supposedly exculpatory information that Mitchel points to had also been included.

A similar analysis applies to the search warrant for Cossu's home.  The plaintiffs complain that Detective Schilling did not make clear that informant Krcal (who told the Detective that Cossu had: (1) visited Mitchel in jail and (2) possibly delivered correspondence from Mitchel to Bowman and others) was in jail and had "credibility problems."  The plaintiffs also complain that Detective Schilling averred Mora heard her attacker say "for my brother, Mitchel," when Mora actually only stated she heard "for my brother."  Examining the entirety of the affidavit, however, no reasonable fact-finder could conclude Detective Schilling showed a reckless disregard for the truth.  Although the Detective did not make clear that informant Krcal was in jail, that fact is implied strongly because the statement to Cossu that Krcal overheard was made by Mitchel <u>while in jail</u>.  The "for my brother" statement was not

37

misleading, given that Mora had, by that time, identified her attackers out of a photo line-up as Mitchel's brothers, and given other evidence that Mitchel had encouraged his brothers to attack Mora. Once again, Cossu has not shown Detective Schilling displayed any disregard for the truth in his affidavit, and it is extremely likely that the magistrate judge would have issued the warrant even if the alleged omissions and mistakes Cossu identifies were not included.

Finally, the complaints made by the plaintiffs regarding the search of Dante's home are precisely the same as their complaints regarding the search of Cossu's home. For the same reasons, the Court concludes these complaints are unavailing. The plaintiffs' §1983 claims that the Detectives obtained warrants only by recklessly or knowingly including in their affidavits material, false statements must be dismissed.

### 6. Malicious Prosecution.

All of the plaintiffs complain that the Detectives are liable to them for malicious prosecution, because there is a genuine issue of material fact whether the Detectives helped with their prosecution absent probable cause.

The Sixth Circuit Court of Appeals has "recognized a federal claim of malicious prosecution under the Fourth Amendment where plaintiffs alleged that defendants wrongfully investigated, prosecuted, convicted, and incarcerated them." Thacker v. City of Columbus, 328 F.3d 244, 258 (6th Cir. 2003); see Spurlock v. Satterfield, 167 F.3d 995, 1005-07 (6th Cir. 1999) ("malicious prosecution of an individual and continued detention of an individual without probable cause clearly violate rights afforded by the Fourth Amendment"). Although the appellate court has not yet "resolve[d] the elements of a federal malicious prosecution claim, it is clear that a plaintiff must show, at a minimum,

38

'that there was no probable cause to justify [his] arrest and prosecution.'" <u>Thacker</u>, 328 F.3d at 259 (quoting <u>Darrah v. City of Oak Park</u>, 255 F.3d 301, 312 (6th Cir. 2001)).

The <u>Thacker</u> court's analysis of the plaintiff's federal malicious prosecution claim was short and to the point: "Thacker's arrest and prosecution here were justified by probable cause. Because he cannot show the absence of probable cause, Thacker cannot demonstrate any seizure in violation of the Fourth Amendment." <u>Id.</u> Not much more analysis is needed in this case. As discussed above, no reasonable jury could conclude that the prosecutions of Mitchel, Gino, Marco, Dante, Jerome, and Bowman went forward without probable cause. Indeed, the evidence in the record of this proceeding supports the conclusion that probable cause to prosecute these plaintiffs remains even today. The plaintiffs make much of the credibility issues with informant Krcal, the arguable nature of Chiara's mental capacity, and, most especially, the changes and inconsistencies in Mora's stories, in relation to both the alleged 1994 rapes by Mitchel and also the 2001 attack. These arguments help explain why the State eventually dropped its charges; it is fair to conclude that it might be difficult to convince a jury beyond a reasonable doubt that Mitchel, Gino, Marco, Dante, Jerome, and Bowman committed some or all of the crimes of which they were accused. But that is a far different question from whether there exists or existed <u>probable cause</u> to believe the plaintiffs committed these crimes.

This Court has spent an inordinate amount of time examining the evidence submitted by the parties and trying to unravel the tortured history of this case. The Court believes the sum of this evidence supports the following conclusions: (1) Mora probably tried to bolster her civil case against Mitchel by purposefully omitting important information, and falsely creating or exaggerating incriminating evidence; but (2) there was <u>and remains</u> probable cause to believe that some of the plaintiffs may, indeed, have committed some of the crimes of which they were accused. Ultimately,

the state prosecutors dismissed the indictments, and did so fairly soon after continued changes in Mora's stories highlighted how susceptible to attack her credibility would be at trial. But this Court is certain that the sum of incriminating evidence never fell so low that the continued prosecution of Mitchel, Gino, Marco, Dante, Jerome, and Bowman was without probable cause.

7. Excessive Force.

The only remaining Fourth Amendment claim is made by Mitchel, who asserts the Detectives used excessive force when arresting him on February 10, 2001. As noted, the two Detectives entered Mitchel's home and found him sleeping in bed with Chiara Egizio. Mitchel asserts the two Detectives dragged him out of bed onto the floor and kicked him in the ribs and head, leading to the fracture of his sixth rib.

The Detectives do not address this claim anywhere in their briefs, which is part of an unfortunate pattern. Thus, there is no present dispute regarding the material facts – the Detectives broke Mitchel's rib when they arrested him, and there is no evidence that Mitchel resisted or otherwise caused the injury himself. Given the state of the record, this claim must be left for trial.

V. State Law Claims.

In addition to their §1983 Fourth Amendment claims, the plaintiffs also assert a number of state law claims. The analysis of many of these claims runs parallel to the analysis of the Fourth Amendment claims.

40

1. False Arrest, False Imprisonment, Malicious Prosecution.

The plaintiffs assert claims for false arrest and also false imprisonment.  Under Ohio law, however,

> [a] claim for false imprisonment and a claim for false arrest require proof of the same essential elements.  The only difference between the two claims is the manner in which each claim arises: "In a false arrest, [a] false imprisonment exists, but the detention is by reason of an asserted legal authority to enforce the processes of the law; in a false imprisonment, the detention is purely a matter between private persons for a private end, and there is no intention of bringing the person detained before a court, or of otherwise securing the administration of the law."

Davis v. Peterson, 1995 WL 134796 at *2 (Ohio Ct. App. March 29, 1995) (quoting Rogers v. Barbera 170 Ohio St. 241, 243 (1960)).  Thus, the claims asserted by plaintiffs against the two Detectives are characterized accurately as claims for false arrest, not false imprisonment.

To be liable for false arrest, "the defendant must have intentionally confined the plaintiff within a limited area, for any appreciable time, without lawful privilege or the plaintiff's consent."  Id. Importantly, however, if "a proper complaint was filed and a legal arrest warrant was issued and served on [the] plaintiff," then the claim for false arrest must fail.  Buchheit v. Youngstown State Univ., 670 N.E.2d 1379, 1382 (Ohio Ct. Cl. 1996).  "An arrest is unlawful if it is made without probable cause or by a person unauthorized to make an arrest."  Id.  Thus, if probable cause to arrest exists, a claim for false arrest fails as a matter of law.  Id.

Similarly, the elements of the state law tort of malicious prosecution are: "(1) malice in instituting or continuing the prosecution; (2) lack of probable cause, and (3) termination of the prosecution in favor of the accused."  Garza v. Clarion Hotel, Inc., 695 N.E.2d 811, 813 (Ohio Ct. App. 1997).  Thus, if a prosecution is undertaken with probable cause, a claim for malicious prosecution fails as a matter of law.  Id. at 814.

41

Given this law, it is easy to see that the analysis of the plaintiffs' claims for false arrest and malicious prosecution under Ohio law yields the same results as the analysis of the plaintiffs' federal law claims for illegal arrest and prosecution.  In each case, the claims fail to the extent probable cause existed.  As such, the plaintiffs' claims for malicious prosecution all fail, the plaintiffs' claims for false arrest stemming from the March 2, 2001 re-arrests all fail, and the claims of Mitchel, Dante, Jerome, and Bowman for false arrest stemming from their initial arrests also all fail.  The claims of Gino, Marco, and Renee for false arrest stemming from their initial arrests, however, remain pending for trial.

Finally, in addition to claims of false arrest and malicious prosecution, Bowman also claims that the Detectives violated: (1) Article I, §14 of the Ohio Constitution, which is the State analog to the Fourth Amendment; and (2) Ohio Rev. Code §2905.03, which prohibits unlawful restraint.  Given that, at all relevant times, there existed probable cause for the Detectives to arrest and prosecute Bowman, these claims also fail as a matter of law.

### 2. Assault and Battery.

Mitchel brings a claim of assault and battery against the Detectives, premised on the broken rib he received during his arrest.  For the same reasons that the Detectives must defend against Mitchel's federal law excessive force claim at trial, they must also defend against his state law assault and battery claim.  The defendants have not addressed this claim on the merits anywhere in their briefs.  The only evidence of record is Mitchel's testimony that the Detectives broke his rib when they arrested him, and they did so maliciously or recklessly.  Given that these assertions are undisputed, state law immunity cannot apply.  The current state of the evidentiary record requires this claim be left for trial.

3. Invasion of Privacy.

As noted in footnote 1, above, the Court's Order dated February 24, 2000 (docket no. 110) included a chart of the plaintiffs' claims; this chart listed a claim for invasion of privacy.  It now appears to the Court, however, after having re-examined the operative complaints in each case, that no plaintiff actually states a claim for invasion of privacy.  The plaintiffs only make the most passing reference to the tort (e.g., Periandri's first amended complaint at ¶73, under the heading of "False Arrest / False Imprisonment"), do not set out any separate claim for the tort, and do not recite the tort's constituent elements.  In their summary judgment motion, the defendants do note the plaintiffs' reference to the tort of invasion of privacy, but analyze it together with the defamation claim.  In their responses, the plaintiffs do not set out any separate argument or analysis of a claim for invasion of privacy.

For the sake of thoroughness, the Court examines briefly this alleged tort, even though the Court believes no plaintiff stated a claim for invasion of privacy.  The Court concludes that summary judgment on this claim in favor of the defendants is easily justified.  In Piro v. Franklin Twp., 656 N.E.2d 1035 (Ohio Ct. App. 1995), an Ohio court analyzed a similar claim:

> The tort of invasion of privacy includes four distinct causes of action: intrusion into the plaintiff's seclusion, solitude, or private affairs; public disclosure of embarrassing private facts about the plaintiff; publicity that places the plaintiff in a false light; and appropriation of the plaintiff's name or likeness for the defendant's advantage.  Killilea v. Sears, Roebuck & Co. (1985), 27 Ohio App.3d 163, 166, 27 OBR 196, 198-199, 499 N.E.2d 1291, 1294, citing Restatement of the Law 2d, Torts (1977) 376, Section 652A.  [Plaintiff] Piro asserts that appellees arrested him without probable cause.  By doing so, they allegedly intruded into his private affairs and produced publicity that placed him in a false light.  As noted previously, however, appellees had probable cause to arrest Piro.  Because appellees had probable cause, their arrest constituted neither a wrongful intrusion into Piro's private affairs nor publicity that placed him in a false light.  The trial court, therefore, did not err in granting summary judgment to appellees on Piro's invasion of privacy claim.

43

Piro, 656 N.E.2d at 1044.

Just as in the <u>Piro</u> case, and as discussed above, the prosecutions of Mitchel, Gino, Marco, Dante, and Bowman in this case were undertaken with probable cause.  Further, the plaintiffs have neither argued nor shown that any matters publicized by the defendants were "not of legitimate concern to the public."  <u>Strussion v. Akron Beacon Journal Pub. Co.</u>, 2002 WL 1371166 at *5 (Ohio Ct. App. June 26, 2002) (citing <u>Killilea v. Sears, Roebuck & Co.</u>, 499 N.E.2d 1291, 1294-95 (Ohio Ct. App. 1985)).[21]  Thus, the plaintiffs cannot prevail on this claim as a matter of law.  Finally, even if there was some argument that a claim for invasion of privacy might otherwise survive, the plaintiffs have not shown that any invasion of privacy by the Detectives was undertaken "with malicious purpose, in bad faith, or in a wanton or reckless manner."  Ohio Rev. Code §2744.03(A).  Thus, the Detectives are immune from liability for this claim.  Accordingly, this claim must be dismissed.

### 4. Infliction of Emotional Distress.

The plaintiffs bring claims for both negligent and intentional infliction of emotional distress. The elements of a claim for <u>intentional</u> infliction of emotional distress are: (1) the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; (2) the actor's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community; (3) the actor's actions were the proximate cause of plaintiff's psychic injury; and (4) that the mental anguish suffered by plaintiff is serious and of a nature that no reasonable man

---

[21]  The <u>Strussion</u> court explained that the fifth element of the "publicity" variety of the tort of invasion of privacy is "that the matter publicized was not of legitimate concern to the public." 2002 WL 1371166 at *5.

44

could be expected to endure it.  Walkosky v. Valley Memorials, 765 N.E.2d 429, 432 (Ohio Ct. App. 2001).

The facts of this case show that no reasonable jury could conclude the plaintiffs meet the second element of a claim for intentional infliction of emotional distress.[22]  It is "not . . . enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort."  Yeager v. Local Union 20, 453 N.E.2d 666, 671-72 (1983).  "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"  Id.

Here, no reasonable juror could conclude that any of the Detectives' actions were "outrageous" or "beyond all bounds of human decency."  Can the Detectives' conclusions that there existed probable cause to believe the plaintiffs' engaged in criminal acts reasonably be second-guessed?  Certainly.  But were the Detectives' conclusions, and their actions based on those conclusions, intolerable and atrocious?  Given the facts of this case, and as a matter of law, they were not – with two exceptions. The first exception is when the Detectives allegedly broke Mitchel's rib when they arrested him.

_____

[22]  The Court also notes that, with regard to the fourth prong, the term "serious" goes "beyond trifling mental disturbance, mere upset or hurt feelings;" rather, the emotional injury must be both "severe and debilitating."  Paugh v. Hanks 6 Ohio St.3d 72, 78 (1983).  It appears, at best, questionable whether a reasonable jury could conclude that plaintiffs meet this element of the tort. Inasmuch as "serious emotional distress" is one of the elements of negligent infliction of emotional distress also, this conclusion also applies to the negligence tort.  Schultz v. Barberton Glass Co., 447 N.E.2d 109, 110 (Ohio 1983).

Depending on what actually happened, a jury could reasonably conclude that the Detectives did act outrageously and intolerably by breaking Mitchel's rib.  Thus, the Court concludes the Detectives are entitled to summary judgment on the claims for intentional infliction of emotional distress by all plaintiffs, except for Mitchel, in connection to his excessive force / assault and battery claims.  The second exception is the Detectives' arrest of Renee Seese.  Given the evidence so far adduced, a jury could reasonably conclude that the Detectives did act outrageously and intolerably when they arrested Renee, because she had done absolutely nothing to suggest any role in the Mora attack.  The only connection presented to the Court is that she was married to Dante, who was driving "her" car on the night of the attack.  Indeed, it appears she was entirely forthcoming when the Detectives asked her about Dante's whereabouts, and they only arrested her after she helped secure Dante's arrest.  A reasonable jury could conclude that the Detectives acted "outrageously" when they arrested Renee, on the evidence so far presented.

As for the claim of <u>negligent</u> infliction of emotional distress, "Ohio courts have limited recovery for negligent infliction of emotional distress to such instances as where one was a bystander to an accident or was in fear of physical consequences to his own person." <u>High v. Howard</u>, 592 N.E.2d 818, 820-21 (1992), <u>overruled on other grounds</u>, <u>Gallimore v. Children's Hosp. Med. Ctr.</u>, 617 N.E.2d 1052 (1993).  The "accident bystander" variety is not implicated in this case, and nowhere does any plaintiff – except for Mitchel – point to any fact (or even allege in the complaint) that he was in fear of physical consequences.  Thus, the Court also concludes that the Detectives are entitled to summary judgment on the claims for negligent infliction of emotional distress by all plaintiffs, except for Mitchel.

<u>5. Defamation</u>.

46

Bowman brings a claim of defamation, asserting that the Detectives defamed her "by maliciously and publicly spreading false and misleading information to the news media which damaged [her] reputation and caused mental distress and other losses." Second amended complaint at ¶76. The elements of a claim of defamation are: (1) assertion of a false statement; (2) the false statement must be defamatory; (3) the false statement was published by the defendant; (4) the publication was the proximate cause of an injury to the plaintiff; and (5) the defendant possessed the required degree of fault. Celebrezze v. Dayton Newspapers, Inc., 535 N.E.2d 755, 759 (Ohio Ct. App. 1988).

As the Piro court noted in its discussion of the tort of invasion of privacy, "[b]ecause [the police officers] had probable cause, [the plaintiff's] arrest constituted neither a wrongful intrusion into [the plaintiff's] private affairs nor publicity that placed him in a false light." Piro, 656 N.E.2d at 1044. Similarly, the arrest and prosecution of Bowman was at all times supported by probable cause, and Bowman does not identify (nor has the Court come across any evidence of ) any statement by any individual that was false or defamatory. Indeed, Bowman's opposition brief does not mention the word defamation. In addition, even if Bowman's defamation claim might otherwise survive, she has not adduced any evidence that the Detectives published any statement "with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code §2744.03(A). Thus, the Detectives are immune from liability for this claim. Accordingly, the defamation claim must be dismissed.

6. Trespass.

Bowman also brings a claim for trespass, premised upon essentially the same facts supporting her Fourth Amendment claim that the Detectives conducted an illegal search of her property. That is, Bowman asserts that the Detectives committed an illegal trespass when they entered her home on

47

February 28, 2001, without a warrant, to arrest her.  The Court explained above why Bowman's Fourth Amendment claim premised on illegal entry of her home must remain for trial.  Among other observations, the Court noted that warrantless entries are permitted only under limited circumstances, and the Detectives offer absolutely no argument suggesting that those limited circumstances existed.

"To state a cause of action in trespass a property owner must prove two essential elements: 1) an unauthorized intentional act, and 2) an intrusion that interferes with the owner's right of exclusive possession of her property."  Weir v. East Ohio Gas Co., 2003 WL 1194080 at *3 Ct. App. March 12, 2003) (citing Brown v. Scioto Cty. Bd. of Commrs., 622 N.E.2d 1153, 1161 (Ohio Ct. App. 1993)).  As explained in the context of Bowman's Fourth Amendment claim of illegal entry, there remains a jury question as to whether the Detectives' act in entering Bowman's home was "authorized."  Any reasonable officer should know that, absent consent or exigent circumstances, a warrant is necessary before entering someone's home.  It is undisputed that the Detectives had no warrant, and they offer no argument that there existed exigent circumstances.  Thus, state law on qualified immunity does not protect the Detectives, as the Court cannot conclude as a matter of law that the Detectives did not act recklessly.  Accordingly, Bowman's trespass claim must remain for trial.

### 7. Loss of Consortium.

The following plaintiffs assert claims for loss of consortium: Angela Periandri, who is Gino's spouse; Sheila Periandri, who is Marco's spouse; and Renee Seese, who is Dante's spouse.  "To maintain a spousal consortium claim, the plaintiff at trial must prove three elements: 1) that the defendant negligently or intentionally caused the injuries of the plaintiff's spouse; 2) that the plaintiff has suffered a loss of consortium; and 3) the injuries of plaintiff's spouse have caused the loss of

48

consortium." Brockmeyer v. Mansfield General Hosp., 1987 WL 7154 at *3 (Ohio Ct. App. Feb. 25, 1987); see Clouston v. Remlinger Oldsmobile Cadillac, Inc. 22 Ohio St.2d 65 (1970) (explaining that a claim of loss of consortium, although a separate cause of action, is essentially premised upon the intentional and/or negligent injury of an individual's spouse); Tomlinson v. Skolnik, 540 N.E.2d 716, 719 (Ohio 1989) ("[a] claim for loss of consortium is a derivative action").

The Detectives focus only on the first element, arguing that, because they caused no injury to Gino, Marco, or Dante, the loss of consortium claims must fail. Given that Gino and Marco still have claims that survive the Detectives' motion for summary judgment, however, Angela's and Shiela's loss of consortium claims also survive. Renee's loss of consortium claim does not survive because, as explained immediately below, Dante has nor surviving claims; thus, Renee's derivative claim for loss of consortium also does not survive.


VI. Dante's Bankruptcy.

The Court's analysis of Dante's claims yields the result that Detectives Quirino and Schilling are entitled to summary judgment on all of them except one: his claim that his Fourth Amendment rights were violated when the Detectives entered his home to arrest him without a warrant. See section IV.A.4 of this opinion. The Detectives have moved separately and additionally for summary judgment on all of Dante's claims, asserting the grounds of judicial estoppel. Specifically, Dante filed for bankruptcy on August 10, 2001, and his debts were discharged by the Bankruptcy Court on June 21, 2002. On February 21, 2002 – during the pendency of his bankruptcy case – Dante filed the instant lawsuit against the Detectives. Dante did not, however, amend his bankrtupcy petition to include this lawsuit as an asset of the bankruptcy estate. The Detectives argue that this failure now estops Dante

49

from pursuing his claims in this case.

"The doctrine of judicial estoppel bars a party from (1) asserting a position that is contrary to one that the party has asserted under oath in a prior proceeding, where (2) the prior court adopted the contrary position 'either as a preliminary matter or as part of a final disposition.'" Browning v. Levy, 283 F.3d 761, 775 (6th Cir. 2002) (quoting Teledyne Indus., Inc. v. NLRB, 911 F.2d 1214, 1218 (6th Cir. 1990)).  The doctrine has been applied when, as here, a debtor in bankruptcy fails to adhere to his statutory, continuing duty to disclose assets.  See, e.g., Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414 (3rd Cir. 1988) (precluding former Chapter 11 debtor from prosecuting a claim in a non-bankruptcy forum, because the debtor had not disclosed this possible claim in bankruptcy court); In re Tennyson, 313 B.R. 402, 407 (Bankr. W.D. Ky. 2004) ("[j]udicial estoppel may be used to bar would-be plaintiffs who failed to schedule causes of action in their prior bankruptcy cases").  The Sixth Circuit Court of Appeals has made clear, however, that application of the doctrine of judicial estoppel in these circumstances "is inappropriate in cases of conduct amounting to nothing more than mistake or inadvertence."  Browning , 283 F.3d at 776.  A debtor's failure to disclose a cause of action in a bankruptcy proceeding may be deemed inadvertent in two circumstances: "where the debtor lacks knowledge of the factual basis of the undisclosed claims, and . . . where the debtor has no motive for concealment."  Id.; In re Tennyson, 313 B.R. at 407.[23]

The Detectives assert that Dante had a motive to conceal this lawsuit as an asset because, if he succeeds in his claims in this case, he will "stand[] to gain a monetary judgment that would be free and clear from creditors' claims."  Motion at 4.  Dante responds that this is true of every debtor who fails

---

[23]  Dante concedes he had "knowledge of the factual basis of his undisclosed claims." In re Tennyson, 313 B.R. at 407.

to list a lawsuit containing an inchoate claim as an asset in bankruptcy, including those debtors whose failure is wholly inadvertent. Dante insists his failure was, in fact, inadvertent, and he simply did not understand his obligation to amend his financial statements in bankruptcy court.

It is important to note that whether a debtor had a "motive for concealment" in bankruptcy court is different from whether the debtor's failure to list an asset was, in fact, actuated by that motive. It is the former question that this Court must examine. In Browning, the Sixth Circuit noted that the debtor, NW,

> had no motive for concealment in light of its role as a debtor-in-possession, having all the rights and duties of a trustee. 11 U.S.C. §1107. Under Nationwise's Plan of Reorganization, all of the estate's assets are to be reduced to cash by NW and distributed to creditors in accordance with the terms of the plan and the priority provisions of the Bankruptcy Code. NW will thus receive no windfall as a result of its failure to disclose its claims, because only Nationwise's creditors will receive the distribution of any recovery from SSD. This lack of motive for concealment leads to the conclusion that NW's failure to disclose was, without any evidence to the contrary, inadvertent. SSD provides no evidence that NW intended to "have its cake and eat it too."

Browning, 283 F.3d at 776. A critical factor, then, according to the Browning court, is whether the debtor might receive a windfall as a result of his failure to disclose a legal claim in bankruptcy. The Tennyson court applied this analysis as follows:

> With respect to motive, the failure to list these rescission claims would result in any non-exempt equity in the real property going to the plaintiffs as opposed to the

51

> bankruptcy estate.  Furthermore, any monetary damages from the various claims above
> the exemption level would go to the benefit of the plaintiffs and not their bankruptcy
> estate.  Under the test adopted by Sixth Circuit in the <u>Browning</u> case, this court must
> conclude that the failure to list the claims was not inadvertent.

<u>Tennyson</u>, 313 B.R. at 407.  Notably, the <u>Tennyson</u> and <u>Browning</u> courts did not examine whether the debtor's failure to disclose claims in bankruptcy court was <u>actually</u> motivated by the possibility of obtaining a windfall, or instead was simply a mistake; rather, the courts simply examined whether the possiblity of a windfall, and thus the motive, existed.  Indeed, to do otherwise would allow a debtor to avoid listing a claim as an asset simply by averring, after the bankruptcy court's discharge of debts, that he honestly forgot the asset existed, or worse (as here), that he knew the asset existed but simply did not appreciate his obligation to disclose it.

Dante avers he simply forgot to list as an asset in bankruptcy his claims against the Detectives.  But he concedes, as he must, that: (1) he now he stands to gain a monetary judgment that would be free and clear from his creditors' claims; (2) had he disclosed his claims in the bankruptcy proceeding, the bankruptcy court could have concluded these claims should be used to satisfy some of his debt; and (3) he was aware of the fact of, and the legal underpinnings for, his claims prior to his discharge in bankruptcy.  Accordingly, the Court finds the Detectives' judicial estoppel argument well-taken.  On this basis, the Detectives are entitled to summary judgment on Dante's Fourth Amendment claim premised on the warrantless entry of his home.


## VII.  Delgado's Claims.

Unlike all of the other plaintiffs in this case, Detectives Schilling and Quirino did not investigate Delgado before the February 27, 2001 attack on Mora, nor arrest him immediately after the attack.  Because Delgado's alleged links to the attack are different, the Court examines his claims separately,

52

below.  The previously cited law applicable to his claims, however, remains the same.

To quickly review the facts relevant to Delgado: the Detectives had no reason to suspect that Delgado had any connection with the Periandris, or the attack on Mora, until March 5, 2001 – six days after the attack – when informant Krcal gave the Detectives some letters, purportedly written by Mitchel.  In these letters, Mitchel: (1) asked Delgado, along with various Periandri family members and Bowman, to kill Mora and Sporcich; and (2) revealed an alleged plot to kill Detective Quirino, possibly by hiring Delgado.  When the Detectives obtained these documents from Krcal, they knew that Krcal and Delgado had spent time in jail together, and also knew that Krcal had accurately predicted the attack on Mora.

Later the same day that he received these letters from Krcal, Detective Quirino was walking to his car when he became certain he was being followed by an Hispanic male.  The next day, March 6, 2001, Quirino acquired a photograph of Delgado, and was "97% sure" Delgado had been the person following him.  Delgado was arrested on March 7, 2001, pursuant to a warrant; the following day, March 8, 2001, a search of Delgado's home uncovered an address book with Quirino's name in it.  Thereafter, at least two different witnesses affirmed that Delgado and Mitchel knew each other; further, during an interview by Detective Quirino, Delgado showed familiarity with non-public details of the Mora attack.  On March 12, 2001, the grand jury returned an indictment charging Delgado and Mitchel with conspiring to murder Detective Quirino.  During his first few days in jail, Delgado did not receive the daily insulin shots he needed, despite his requests for them.   From the time of his arrest, Delgado insisted he did not know any of the Periandris or Detective Quirino, nor had he ever followed or stalked Detective Quirino.  On May 16, 2001, the charge against Delgado was dismissed without prejudice.

The Court now analyzes all of Delgado's claims, but does not repeat all of the applicable law

recited above.

A. Fourth Amendment Claims.

1. Arrest for Conspiracy to Murder Detective Quirino.

Delgado argues that probable cause did not exist to support his arrest for conspiracy to murder Detective Quirino. Delgado insists he never met any of the Periandris before this case was filed and never stalked, followed, or even knew of Detective Quirino. Delgado attacks the information obtained by the Detectives suggesting he had some connection to the Periandris or some other role in this case by noting as follows: (1) informant Krcal, who provided the Detectives with the documents that first suggested Mitchel had hired Delgado to murder Detective Quirino, was known to have a history of criminal dishonesty, including forgery; (2) Detective Quirino's story about having been stalked or followed by an Hispanic male is suspect; (3) Delgado never even received the letter purportedly from Mitchel, given that it was intercepted by Krcal and the Detectives; and (4) while Detective Schilling testified before the grand jury that he interviewed Anthony Christopher Pannetti, and Pannetti stated that Mitchel and Delgado knew each other, Pannetti has tendered an affidavit stating he said no such thing to Schilling, he does not know Delgado, and he does not believe Mitchel knew Delgado. Delgado insists these facts show there never existed probable cause to believe he had any link to Mitchel, the Detectives should have known this to be true, and the Detectives even manufactured false evidence to procure probable cause.[24]

With regard to the second point – Detective Quirino's story about having been stalked –

_____

[24] The Court notes, however, that it was not presented with any testimonial evidence from Mitchel that he did not know Delgado.

54

Delgado is especially forceful.  Delgado insists it is extremely unlikely that Detective Quirino would have waited until the next day to try and identify his stalker.  Delgado also notes that: (a) the weather and lighting conditions at the time of the stalking incident were not ideal for observing and identifying someone, so the Detective's having been "97% sure" that it was Delgado who was following him is questionable; and (b) Delgado's own eyesight is so bad, due to his diabetes, that he couldn't possibly stalk anybody anyway.  Delgado ultimately concludes that Detective Quirino's testimony before the grand jury, about having been stalked by someone whom he was "97% sure" was Delgado, was "highly problematic;" Delgado even seeks to imply it was simply false, and the Detective made up the stalking story to provide a basis for Delgado's arrest.

Delgado goes even further in connection to the fourth point listed above, arguing explicitly that Detective Schilling did offer false and perjurious testimony before the grand jury, in order to link Mitchel with Delgado.  Delgado, who asserts he never knew Mitchel before this case, contends that Detective Schilling falsely quoted Pannetti before the grand jury.  Detective Schilling testified that Pannetti told him he knew Delgado through Mitchel.  Pannetti avers he never said that to Schilling and does not know Delgado.  Delgado insists Schilling made his false statement to give the grand jury the false impression that Mitchel and Delgado could have conspired together, and actually did.  Delgado ultimately concludes that, in fact, there did not exist probable cause to arrest him, and the Detectives knew this to be true.

The Court concludes, however, that Delgado's arguments are unpersuasive.  First of all, it need not be true that, for probable cause to exist, all arrows "point the same direction."  Thus, for example, even if the Detectives knew when they arrested Delgado that he had vision problems so severe that it would make it difficult for him physically to stalk somebody, this fact would not absolutely preclude

the existence of probable cause.[25]  It only need be true that the sum of all the facts and circumstances within the officer's knowledge "are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense" DeFillippo, 443 U.S. at 37.  Here, the Detectives knew that: (1) an informant, who had reliably predicted the Mora attack, produced documentary evidence suggesting that Mitchell was soliciting Delgado to kill them; and (2) on the very same day the Detectives viewed these documents, one of them was followed in a suspicious manner by a person who appeared to be Delgado.  These facts easily establish probable cause.

The arguments mustered by Delgado, seeking to undercut probable cause, are unavailing. Delgado asserts that Detective Quirino's stalking story is "problematic," but Delgado's suspicions come nowhere near proving that Quirino presented the grand jury with false testimony.  Indeed, Detective Quirino's testimony to the grand jury on this point, though not subject to cross-examination, was straightforward and consistent.  As for the Detectives' knowledge that Krcal had a history of criminal dishonesty, this fact was completely overshadowed by the accuracy of Krcal's other knowledge and tips that were specific to this case.  As for Detective Schilling's testimony about Pannetti and the "connection" between Mitchel and Delgado, this testimony was virtually immaterial.  The grand jury transcript of March 12, 2001, is 127 pages long; five of those pages reflect testimony by Detective Schilling, and the rest reflect testimony by Detective Quirino.  Schilling's testimony about the Pannetti / Mitchel / Delgado connection was very brief.  In contrast, just before Detective Schilling testified, Detective Quirino related that both Sporcich's husband and Mora affirmed that Mitchel and Delgado

---

[25] In fact, there is no evidence that the Detectives knew of Delgado's vision problems when they arrested him, nor is there any evidence beyond Delgado's own, vague assertion that his vision problems are that severe.

knew each other.  Indeed, James Sporcich picked Delgado out of a photo lineup and stated he, Mitchel, and Delgado had smoked marijuana together; Mora also picked Delgado out of a photo lineup, stated she had seen Mitchel and Delgado together many times, and that Mitchel frequently boasted that Delgado supplied him with high-grade drugs.

To overcome an officer's entitlement to qualified immunity, a plaintiff must establish "that the allegedly false or omitted information was material to the finding of probable cause." Vakilian, 335 F.3d at 517.  Put simply, upon reading all of the grand jury transcript, the Court easily concludes that: (1) the entirety of the Detectives' testimony was in no way false or misleading; and (2) even if certain portions of the testimony were false, that portion was immaterial and the remainder of the evidence easily supplies probable cause.

Ultimately, Delgado's argument that probable cause did not exist fails because the grand jury issued an indictment and Delgado has not shown this indictment would not have issued absent perjured testimony.  Indeed, by the time the indictment issued, the Detectives had obtained additional information connecting Delgado with the alleged plot, including: (1) an address book found in his home with Quirino's name in it; and (2) Delgado's own statements referring to non-public details of the Mora attack.  These facts, together with the documents provided by Krcal, certainly established probable cause for the indictment to issue, even if certain testimony by the Detectives was inaccurate or incomplete.  As a matter of law, based on the undisputed facts, Delgado cannot demonstrate a violation of his Fourth Amendment rights in connection with his arrest for conspiring to murder the Detectives, because the arrest was supported by probable cause.  Accordingly, the Court may end its qualified immunity analysis here. Saucier, 533 U.S. at 201.

57

2. Excessive Force.

Although Delgado makes passing reference, in his amended complaint, to his right to be free from the use of excessive force, he does not point to any facts suggesting that he was actually subjected to excessive force, nor does he discuss this claim at all in his briefs.  Despite a thorough review of all the evidence of record, the Court has found absolutely no reference to any injury suffered by Delgado in connection with his arrest by the Detectives.

Delgado does state, in his factual recitation, that, during his first few days in jail, he did not receive the daily insulin shots he needed, despite his requests for them.  Conceivably, this assertion could support a claim for violation of his Eighth Amendment right to be free of cruel and unusual punishment.  See Estelle v. Gamble, 429 U.S. 97, 104 (1976) (prison authorities may be sued for deliberate indifference to the serious medical needs of prisoners under the Eighth Amendment, because such indifference can constitute unnecessary and wanton infliction of pain).  But Delgado does not assert any such claim, and Detectives Schilling and Quirino would not be the proper defendants even if he did.

In any event, it is clear that Delgado may not proceed on a claim for use of excessive force. Accordingly, this claim is dismissed.

3. Malicious Prosecution

As noted above, a plaintiff bringing a claim of malicious prosecution under federal law "must show, at a minimum, 'that there was no probable cause to justify [his] arrest and prosecution.'" Thacker, 328 F.3d at 259.  If the plaintiff "cannot show the absence of probable cause, [then he] cannot

58

demonstrate any seizure in violation of the Fourth Amendment." Id.  As previously discussed, no reasonable jury could conclude that the arrest of Delgado occurred absent probable cause.  That the State eventually dropped its charges does not in any way show there did not exist probable cause to believe Delgado committed the crime.

Delgado suggests that, even if his initial arrest was supported by probable cause, the Detectives quickly learned he could not have committed the crime, but they did not timely ensure his prosecution was dropped.  That is, Delgado asserts that continued prosecution was malicious.  To support this argument, Delgado notes that, in mid-April, the Detectives learned from an informant that it was Antonio Alvarez whom Mitchel had hired as a hit man.  But the Detectives' own notes indicate the informant stated that Mitchel had "also" hired Alvarez.  And, there is no evidence showing the Detectives ever learned Delgado's vision problems made it impossible for him to have been the stalker, assuming such evidence actually exists.  In sum, no reasonable jury could conclude that Delgado's prosecution continued after it became clear that probable cause no longer existed; indeed, the Court does not believe probable cause ever ceased to exist.  Accordingly, this claim must also be dismissed.

B. State Law Claims.[26]

1. False Arrest, False Imprisonment, Malicious Prosecution.

As noted above, if "a proper complaint was filed and a legal arrest warrant was issued and served on [the] plaintiff," then the claim for false arrest must fail.  Buchheit, 670 N.E.2d at 1382.  "An

---

[26]  The Court notes here again that, although Delgado stated a claim for trespass in his amended complaint, he later agreed that he was not pursuing that claim.  See claims chart, docket no. 110.  Delgado's summary judgment brief makes no mention of a trespass claim.

arrest is unlawful if it is made without probable cause or by a person unauthorized to make an arrest."
Id.  Thus, if probable cause to arrest exists, a claim for false arrest fails as a matter of law.  Id.
Similarly, if a prosecution is undertaken with probable cause, a claim for malicious prosecution fails
as a matter of law.  Garza, 695 N.E.2d at 814.  Accordingly, analysis of Delgado's claims for false
arrest and malicious prosecution under Ohio law yields the same results as the analysis of his federal
law claims for illegal arrest and prosecution.  These claims must be dismissed.

2. Invasion of Privacy.

For all of the same reasons that the Court granted summary judgment to the defendants on the
invasion of privacy claims by all the other plaintiffs, the defendants are entitled to summary judgment
on Delgado's privacy claim.  Included among these reasons is that Delgado does not actually assert a
privacy claim in his complaint, he has neither argued nor shown that any matters publicized by the
defendants were not of legitimate concern to the public, and he has not shown that any possible
invasion of privacy by the Detectives was undertaken "with malicious purpose, in bad faith, or in a
wanton or reckless manner."  Ohio Rev. Code §2744.03(A).   Accordingly, this claim is dismissed.

3. Infliction of Emotional Distress.

For all of the same reasons that the Court granted summary judgment to the defendants on the
emotional distress claims by various other plaintiffs, the defendants are entitled to summary judgment
on Delgado's emotional distress claims.  As to the claim of intentional infliction of emotional distress,
no reasonable jury could conclude that any of the Detectives' actions related to Delgado were
"outrageous" or "beyond all bounds of human decency."  As to the claim of negligent infliction of

emotional distress, Delgado does not adduce any evidence that the Detectives placed him in fear of any physical consequences.  Thus, the Detectives are entitled to summary judgment on Delgado's emotional distress claims.

     4. Defamation.

For all of the same reasons that the Court granted summary judgment to the defendants on Bowman's defamation claim, the defendants are entitled to summary judgment on Delgado's defamation claim.  "Because [the police officers] had probable cause, [the plaintiff's] arrest constituted neither a wrongful intrusion into [the plaintiff's] private affairs nor publicity that placed him in a false light."  Piro, 656 N.E.2d at 1044.  The arrest and prosecution of Delgado was at all times supported by probable cause, and there is no evidence that the Detectives published any statement "with malicious purpose, in bad faith, or in a wanton or reckless manner."  Ohio Rev. Code §2744.03(A).  Thus, the Detectives are immune from liability for this claim.  Accordingly, the defamation claim must also be dismissed.

In sum, the Court concludes the defendants are entitled to summary judgment on all of Delgado's claims.

VIII. Conclusion.

For the reasons stated, the defendants' summary judgment motions are all **GRANTED IN PART and DENIED IN PART**.  The chart attached as Exhibit A shows the status of each of the plaintiffs' claims (those that remain pending for trial are set out in bold, while claims that are dismissed are shown in italics).  Further, because the Court grants summary judgment in favor of defendants on

all claims asserted in <u>Delgado v. Cuyahoga Cty</u>., 1:02-CV-399, that action is **DISMISSED.**  Similarly, because the Court grants summary judgment in favor of defendants on all claims asserted by plaintiff Cossu, she is **DISMISSED** as a party from this case.

In order to determine how this case should proceed, the Court hereby sets a **STATUS CONFERENCE, to take place on October 20, 2004, at 1:30 p.m.**

**IT IS SO ORDERED.**

**s/Kathleen M. O'Malley**
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED:**  September 30, 2004